## UNITED STATES *v.* NEW ORLEANS.

1. The legislative branch of the government has the exclusive power of taxation, but may delegate it to municipal corporations.
2. When such corporations are created, the power of taxation is vested in them as an essential attribute for all the purposes of their existence, unless its exercise be in express terms prohibited.
3. When, in order to execute a public work, they have been vested with authority to borrow money or incur an obligation, they have the power to levy a tax to raise revenue wherewith to pay the money or discharge the, obligation, without any special mention that such power is granted.
4. A limitation imposed by statute upon them, restraining them from creating any indebtedness without providing at the same time for the payment of principal and interest, will not control a subsequent statute, which, without prescribing such limitation, authorizes them to incur a special obligation.
5. Bonds of the city of New Orleans, issued upon a subscription to the stock of a railroad company, under an ordinance which declared that the stock "should remain for ever pledged for the payment of the bonds," are an absolute obligation of the city, the ordinance creating only a pledge of the stock by way of collateral security for their payment.
6. The indebtedness of a city is conclusively established by a judgment recovered against it in a court of competent jurisdiction; and in enforcing payment, the plaintiff is not restricted to any particular property or revenues, or subject to any conditions, unless such judgment so provides.

ERROR to the Circuit Court of the United States for the District of Louisiana.

This was a petition presented in April, 1876, by Morris Ranger, the relator, for a writ of *mandamus* to compel the city of New Orleans to pay three judgments. The petition alleges that he had recovered them in the Circuit Court of the United States for an amount exceeding in the aggregate $59,000 against the city, on its bonds and coupons issued under the provisions of acts of the legislature of Louisiana, passed on the 15th of March, 1854, and designated as Nos. 108 and 109; that executions had been issued upon the judgments and returned unsatisfied; and that there was no property belonging to the city subject to seizure thereon.

It also alleges that in June, 1870, the city had sold eighty thousand shares of stock of the New Orleans, Jackson, and Great Northern Railroad Company, which it held, for the sum of $320,000, and that by the act No. 109, of 1854, these shares were for ever pledged for the payment of the bonds issued under its provisions; that the city should therefore be compelled to pay out of their proceeds so much of the judgments as appears on the face of the records to have been rendered upon the bonds; or, in case their payment cannot be enforced in this way, that it should be compelled to levy and collect a tax for that purpose, and also a tax to pay so much of the judgments as was rendered upon bonds and coupons issued under the act No. 108, of 1854; but that the mayor and administrators, who represent and exercise the powers of the city, refuse to pay the judgments out of any funds in their possession or under their control, or to levy a tax for their payment. The relator therefore prays the court to order them to show cause why a writ of *mandamus* should not be issued compelling them to apply the proceeds and to levy a tax as mentioned.

The order to show cause was accordingly issued; and the city authorities appeared and filed an answer to the petition, in which they admitted the recovery of a judgment by the relator, — speaking of the three judgments as one, — the issue of executions thereon, and their return unsatisfied, the sale of the eighty thousand shares of the capital stock of the New Orleans, Jackson, and Great Northern Railroad Company for $320,000, and the receipt of the money by their predecessors;

and set up as a defence to the prayer of the petition that the judgment was recovered upon certain bonds issued by the city to that company under the act of March 15, 1854, No. 109, making no mention of the act No. 108 ; that no tax for the payment of the principal of the bonds is directed to be levied by that act or any other act of the legislature ; that, as respects the interest on the bonds, provision is made for its payment out of the back taxes due to the city, and inserted in its budget for 1876 ; and that the proceeds arising from the sale of the stock of the railroad company are not in the treasury of the city or under their control, having been used and expended by their predecessors.   They therefore prayed that the petition be dismissed.

The relator demurred to this answer.   The court overruled the demurrer and refused the writ ; and from its judgment the case is brought to this court.

The city of New Orleans was incorporated under the name of " the mayor, aldermen, and inhabitants of the city of New Orleans," by an act of the legislature, approved Feb. 17, 1805, the sixth section of which provides : —

" The said mayor and city council (aldermen) shall have power to raise by tax, in such a manner as to them may seem proper, upon the real and personal estate within said city, such sum or sums of money as may be necessary to supply any deficiency for the lighting, cleansing, paving, and watering the streets of said city; for supporting the city watch, the levee of the river, the prisons, workhouses, and other public buildings, and for such other purposes as the police and good government of the said city may require."

An act approved March 8, 1836, amending that act, constituted in effect a new charter, and divided the city " into three separate sections, each with distinct municipal powers."
The fourth section provided : —

" Each of said municipalities shall possess separate corporate rights, and are hereby declared to be distinct corporations, and *shall possess generally such rights, powers, and capacities as are usually incident to municipal corporations*, . . . and, in general,

shall possess and exercise within their respective limits all such powers, rights, and privileges as are now possessed by the corporation of New Orleans."

The three municipalities thus created were, with the city of Lafayette, consolidated into one, by acts approved Feb. 23, 1852.   Acts La., 1852, Nos. 71, 72, pp. 42, 55.

Sect. 1 of the former act provides : —

" All that portion of the parish of New Orleans on the left bank of the river Mississippi shall be the city of New Orleans, and all the free white inhabitants thereof shall be a body corporate by the name of the 'city of New Orleans,' and by that name they and their successors shall be known in law, and shall be capable of suing and being sued," &c.

Sect. 22 provides : —

" That upon the first organization of the common council of the city of New Orleans, as hereinbefore provided, the city of New Orleans, as established by this act, *shall be vested with all the powers, rights, privileges, and immunities incident to a municipal corporation, and necessary for the proper government of the same ;* and upon the said organization of said council all the powers, rights, privileges, and immunities possessed and enjoyed by the first, second, and third municipalities of New Orleans, and by the general council of the city of New Orleans, shall cease and terminate so far as regards the said municipalities and general council, and be vested in the city of New Orleans, as established by this act."

Sect. 37 provides that the old city debt (prior to 1836) and the debts of the separate municipalities shall be assumed by the city of New Orleans, and that bonds shall be issued therefor, to be called the " consolidated debt ; " and that " from and after the passage of this act no obligation or evidence of debt of any description whatever, except those herein authorized, shall be issued by the city of New Orleans or under its authority ; nor shall any loan be contracted, unless the same be authorized by a vote of the majority of the qualified voters of said city, which shall be taken in the manner prescribed by the city council, after ten days' proclamation by the mayor, in the newspaper chosen by the city council ; *and no ordinance creating a debt or loan shall be valid unless such ordinance shall*

*provide ways and means for the punctual payment of running interest during the whole time for which said debt or loan shall be contracted, and for the full and punctual discharge at maturity of the capital borrowed or debt incurred; and such ordinance shall not be repealed until the principal and interest of the capital borrowed or debt incurred are fully paid and discharged."*

In 1854, the legislature passed two acts by which the city was authorized to subscribe to the stock of the New Orleans, Opelousas, and Great Western Railroad Company, and the New Orleans, Jackson, and Great Northern Railroad Company, and to make the subscription immediately payable in bonds of the city, for $1,000 each, having twenty years to run, &c., and requiring the repeal of ordinances authorizing former subscriptions.

The terms of the two last-named acts, *mutatis mutandis*, are identical.   Acts La., 1854, Nos. 108, 109, pp. 69, 72.

The act authorizing the subscription to the stock of the New Orleans, Jackson, and Great Northern Railroad Company provided, among other things, as follows : —

" SECT. 1. Be it enacted by the Senate and House of Representatives of the State of Louisiana, in General Assembly convened, that it shall be lawful for the common council of the city of New Orleans to subscribe to the stock of the New Orleans, Jackson, and Great Northern Railroad Company, in a sum not exceeding $2,000,000.

" SECT. 2. Be it further enacted, &c., that any ordinance authorizing such subscription shall contain the following provisions, to wit: —

" 1st, A statement of the number and amount of shares for which the city subscribes.

" 2d, That the subscription of the city shall be made by the mayor, and shall be payable in bonds of said city for $1,000 each, having twenty years to run, bearing interest at the rate of six per cent per annum, with interest-coupons attached, payable semiannually in New Orleans or New York, as the company entitled to receive them may prefer, transferable by the indorsement of the president and secretary of said company, and convertible into the stock of said company at the option of the holders, at any time within ten years after their date.

" 3d, That a special tax on real estate and slaves shall be levied in January of each year, *sufficient to pay the annual interest on said bonds,* specifying the rates of said tax, which shall be collected at the same time and in the same manner as the consolidated loan tax of said city; and all ordinances, resolutions, or other acts passed by said council, after the first day of January in each year, except an ordinance to impose said consolidated loan tax, and an ordinance to impose a tax for the payment of interest on bonds which may be hereafter issued for subscription to the New Orleans, Opelousas, and Great Western Railroad Company, shall be null and void, unless a resolution imposing a special tax for the payment of the interest on said bonds issued to the railroad company herein named shall have been previously passed: *Provided,* that no levy of a tax for the payment of interest on said bonds shall be made after the payment of dividends of six per cent per annum on the stock of said company held by the city, as hereinafter provided, which dividends shall be applied by the city to the payment of the interest. *And provided, further,* that whenever the dividends on said railroad stock of the city shall amount to more than six per cent per annum, the excess, after the payment of interest, shall be applied to the purchase of the city bonds issued under the provisions of this act; it being understood that when dividends for less than six per cent per annum are received on the railroad stock of the city, a tax for interest shall be levied for the difference only between the amount of said annual dividends and the amount of the annual interest.

.    .    .    .    .    .    .    .    .    .    .    .    .

" SECT. 3. Be it further enacted, &c., that the city bonds issued to said railroad company shall be received by it at par value, and said railroad company shall issue to the city of New Orleans therefor certificates of stock for an amount equal to the amount of the bonds received, *and the stock of the said company thus issued to the city of New Orleans shall remain for ever pledged for the redemption of said bonds: Provided, however,* that any holder of said bonds who may desire to convert them into the capital stock of the company to which they may have been issued shall, on application to the treasurer of said city, and on surrender to him of the bonds to be converted, receive from said treasurer a transfer of the stock represented by the bonds surrendered, and said bonds shall be immediately cancelled."

The other sections are not material for the disposition of the present case.

The following act of the legislature was approved March 6, 1867 : —

" SECT. 1. Be it enacted by the Senate and House of Representatives of the State of Louisiana, in general assembly convened, that the mayor and administrators of the city of New Orleans, or such other officers, aldermen, or administrators as may hereafter be ordained and established, be and they are hereby authorized and directed to exchange all recognized and valid bonds of the city of New Orleans and the late cities of Jefferson and Carrollton for bonds known as the premium bonds of the city of New Orleans, in accordance with the plan adopted by the city council, and approved by the mayor on the 25th of May and 31st of August, 1875. The said premium bonds shall be dated the 1st of September, 1875, and bear interest at the rate of five per cent per annum, from the 15th of July, 1875; they shall be signed by the mayor, the administrator of finance, and the administrator of public accounts, as commissioners of the consolidated debt, and countersigned, when issued, by such parties as the council have designated heretofore, or may hereafter designate, with the authorization of the supervising committee hereafter named.

" SECT. 2. Be it further enacted, &c., that all outstanding bonds. bearing interest shall have the interest computed up to the first day of July, 1875, and thereafter the said bonds, when exchanged, shall bear interest as provided in the ordinance above ratified, which provides for the premium bonds.

" SECT. 3. Be it further enacted, &c., that the allotment of series and premiums which have been made by virtue of ordinance No. 3233, administration series, adopted Aug. 31, 1875, by the city council, are hereby ratified and approved, and that further allotments shall take place on the fifteenth day of April and the fifteenth day of October of each year, and of premiums on the fifteenth day of January and the fifteenth day of July of each year, or on such other date as the council may prescribe : *Provided,* that payments be not made later than the fifteenth day of March and the fifteenth day of September of each year.

" SECT. 4. Unimportant.

" SECT. 5. Unimportant.

" SECT. 6. Be it further enacted, &c., that it shall be the duty of the city council, in the month of December of each year, or in the annual budget annually adopted for the ensuing year, to include an amount sufficient to meet and pay the principal and interest of

the premium bonds, together with premium included, in the several allotments of series and premiums fixed for such year by the aforesaid ordinances and this act. It shall be the duty of the council annually to levy an equal and uniform tax on all the assessed property within the corporate limits of the city, at a rate sufficient to provide the amount included in the budget as aforesaid, and said tax so levied shall constitute a special fund to be used for no other purpose than the payment of said bonds and interest on the said premiums comprised in said allotments, and the funds so raised shall be placed to the credit of an account to be called the premium-bond account, and no money from said fund shall be paid out except on the joint authority of the commissioners of the consolidated debt. The said tax so to be raised shall be denominated the premium-bond tax, and shall be separately mentioned in the tax rolls and receipts: *Provided,* that the taxable power of the corporation of the city of New Orleans for all purposes, including general administration, school, police, lighting, salary of officers, court expenses, and every other purpose of government, including the sum to be raised to pay the premium bonds, as above stated, shall never, until the full complete and final payment of the said premium bonds, exceed the rate of one and one-half per cent on the dollar of all the assessed value of property subject to taxation within the limits of the said city of New Orleans. The above limitation of the taxable power of the corporation is hereby declared to be a contract, not only with the holder of the said premium bonds, but also with all residents and tax-payers of the said city, so as to authorize any holder of said premium bonds, resident or tax-payer, to legally object to any rate of taxation in excess of the rate herein limited. It being also a part of the consideration of this contract that the city of New Orleans shall be incompetent to incur any debt or obligation, as now provided by the Constitution of this State, until the final payment and extinction of the premium bonds aforesaid.

" SECT. 7. Be it further enacted, &c., that no tax for the payment of bonds or interest on bonds other than that authorized by the preceding sections, shall be levied either for the year 1876, or any year or years thereafter by the city of New Orleans, and that all existing laws requiring or authorizing the city council to levy any tax whatsoever for bonds or interest on bonds, other than said premium bonds, be and the same are hereby repealed; and it shall be hereafter incompetent for any court to *mandamus* the officers of said city to levy and collect any interest tax other than that pro-

vided in this act, or in case of such *mandamus*, by a receiver or otherwise, to direct the levy and collection on any such tax.

"SECT. 8. Unimportant.

"SECT. 9. Unimportant.

"SECT. 10. Unimportant.

"SECT. 11. Be it further enacted, &c., that in addition to the obligation of the said city to provide annually the sum required for the execution of the premium-bond plan, at least a tax of one-half of one per cent annually, to be used in the execution of the provisions of this act; and if the product of said half of one per cent be more than adequate for the payment of the drawn premium bonds, and the premiums as above provided, then the surplus to be used in retiring the outstanding bonds; *Provided*, said half of one per cent taxation be considered as part of the one and a half per cent taxation to which the taxing power of the city is limited in this act; the intention of this section being to limit the city taxation to one and one-half per cent annually until the entire extinction of the bonded debt; to authorize the council to levy annually out of the one and one-half per cent taxation a sum adequate to the annual execution of said premium-bond plan, and after the year 1881 to levy at least one-half of one per cent for the carrying out of said plan, and to distribute the surplus realized therefrom, if any, in retiring the outstanding bonded debt.

"SECT. 12. Unimportant.

"SECT. 13. Unimportant.

"SECT. 14. Unimportant.

"SECT. 15. Be it further enacted, &c., that this act in all its provisions and limitations be held a contract between the city of New Orleans, the holders of said premium-bonds, and the taxpayers or residents of said city, so as to authorize any of the contracting parties to resist any and all contracting of debt by the said city, or increase of taxation above the rate limited in the previous provisions of this act.

"SECT. 16. Be it further enacted, &c., that this act take effect from and after its passage; that all laws or parts of laws inconsistent herewith be and the same are hereby repealed, and that all ordinances of the city of New Orleans conflicting with this act be and are hereby repealed."

*Mr. D. C. Labatt* for the plaintiff in error.

1. Whenever a municipality is expressly authorized to levy a tax for the payment of its obligations, it will, by *mandamus*, be

compelled to do so to satisfy a judgment recovered upon them, where an execution has been returned unsatisfied. *The Board of Commissioners of Knox County* v. *Aspinwall et al.,* 24 How. 376; *Von Hoffman* v. *City of Quincy,* 4 Wall. 535; *Benbow* v. *Iowa City,* 7 id. 313; *Supervisors* v. *Rogers,* id. 175; *The Supervisors* v. *Durant,* 9 id. 415; *County of Cass* v. *Johnston,* 95 U. S. 360.

2. If the statute authorizing or creating debts does not provide the means of paying them, the power to tax in order to raise the means will be held to be *ipso facto* conferred, unless there is an express limitation to that power which forbids such inference. *Loan Association* v. *Topeka,* 20 Wall. 655; *Lowell* v. *Boston,* 111 Mass. 460; *Commonwealth* v. *Commissioners,* 37 Pa. St. 277; *Same* v. *Same,* 40 id. 348; *Same* v. *Same,* 43 id. 403; *Coy* v. *City Council of Lyons City,* 17 Iowa, 1; *Madison County Court* v. *Alexander,* 1 Walker (Miss.), 523; *Gibbons* v. *Mobile & Great Northern Railroad Co.,* 36 Ala. 439; *Ex parte Selma & Gulf Railroad Co.,* 45 id. 730; *City of Chicago* v. *Hasley,* 25 Ill. 595; *Hasbrouck* v. *Milwaukee,* 25 Wis. 122; *Ex parte Parsons,* 1 Hughes, 282.

3. The provision in the act of 1854, that the stock issued to the city should remain "for ever pledged for the redemption of said bonds," does not require the holder of them to first resort to said stock for payment before he can demand it from other funds. On the contrary, only a statutory pledge for the payment of the bonds by way of collateral security was created.

4. It is not alleged in the answer that the statutory limit of taxation has been reached, nor does it appear that any limit existed when these bonds were issued. No limit subsequently imposed can curtail the power or affect the duty of the city in respect to them. *Von Hoffman* v. *City of Quincy, supra; Butz* v. *Muscatine,* 8 Wall. 575; *Milner's Adm'r* v. *Pensacola,* 2 Wood, 641, and cases there cited; *Commissioners* v. *Rather,* 48 Ala. 446, and cases there cited.

*Mr. B. F. Jonas* and *Mr. Henry C. Miller* for the defendants in error.

1. The taxing power is vested in the Legislative Department of the government. A *mandamus* is only effective to compel

the levy of a tax, when that department has directed or authorized such tax to be imposed. If no tax has been provided for the payment of the bonds on which the judgments in this case were recovered, granting the *mandamus* would be an assumption of legislative power, and the application for the writ must therefore necessarily fail. *Rigg* v. *Johnson County*, 6 Wall. 166; *Supervisors* v. *United States*, 18 id. 71; *Heine* v. *The Levee Commissioners*, 19 id. 655; *Rees* v. *City of Watertown*, id. 107.

The act under which the bonds were issued provided only for a tax to pay the annual interest on them until the dividends should amount to that interest. An absolute prohibition of any other tax was, therefore, necessarily implied. It was believed that the stock itself, " to remain for ever pledged for the redemption of the bonds," would prove a full equivalent for them, and that before their maturity the dividends on it would not only pay the interest, but produce a surplus. Hence the provision that the excess after paying the interest should be applied to purchase them. A tax for the principal would be repugnant to the manifest intent of the legislature, and it is actually prohibited by evident implication.

2. The relator maintains the doctrine that the power to tax is implied from the power to contract, and that whenever a judgment against a municipal corporation is unpaid, the exercise of the taxing power can be coerced by suit. It is difficult to reconcile that doctrine with the principle, heretofore acknowledged to be axiomatic, that the objects of taxation, the mode in which taxes are to be levied and collected, and the purposes to which they are applied, are subjects under the exclusive control of the Legislative Department. The latter must determine how the public debts are to be provided for; and while taxation is the ordinary means of raising the public revenues, they are often drawn from other sources. But this principle is completely ignored, if the mere power of such a corporation to contract confers on its creditor the right to compel the levy of a tax, when his debt exists in the form of unsatisfied judgments. For if without a law expressly authorizing such levy to pay them, the exercise of the taxing power can be enforced by judicial process, that power will, to a certain extent, be

transferred from the law-making branch of the government and be vested in the courts of the country.

3. The act of March 6, 1876, prohibits the city from levying any tax for bonds, or the interest on them, except that thereby authorized, and excludes the relator's bonds. This legislation gave him no right to the tax he asks. The principal of his bonds has been provided for in the act of 1854. The power of the legislature to modify, change, and repeal taxation is unrestricted, provided the taxes in existence when the debt is created are preserved to the creditor. *Von Hoffman* v. *The City of Quincy*, 4 Wall. 535.

MR. JUSTICE FIELD, after stating the case, delivered the opinion of the court.

The judge of the Circuit Court accompanied the judgment with an opinion giving the reasons of his decision, which were substantially those stated in the answer of the city: that the statute authorizing the issue of the bonds, upon which the judgments were recovered, made no provision for levying a tax to pay the principal, but intended that it should be paid out of the stock of the railroad company and its revenues; and that the proceeds from the sale of the stock had been already expended by the predecessors of the present city authorities. The court, adopting the view of the city authorities as to the construction of the statute, and the supposed intention of the legislature, proceeded on the principle that the power of taxation belongs exclusively to the legislative branch of the government, and that the judiciary cannot direct a tax to be levied when none is authorized by the legislature; and that the issuing of a *mandamus* to apply the proceeds received from the sale of the stock would be a futile proceeding, they having been previously used for other purposes. A writ, said the court, could not issue commanding the performance of an admitted impossibility.

The position that the power of taxation belongs exclusively to the legislative branch of the government, no one will controvert. Under our system it is lodged nowhere else. But it is a power that may be delegated by the legislature to municipal corporations, which are merely instrumentalities of the State

for the better administration of the government in matters of local concern. When such a corporation is created, the power of taxation is vested in it as an essential attribute, for all the purposes of its existence, unless its exercise be in express terms prohibited. For the accomplishment of those purposes, its authorities, however limited the corporation, must have the power to raise money and control its expenditure. In a city, even of small extent, they have to provide for the preservation of peace, good order, and health, and the execution of such measures as conduce to the general good of its citizens; such as the opening and repairing of streets, the construction of side-walks, sewers, and drains, the introduction of water, and the establishment of a fire and police department. In a city like New Orleans, situated on a navigable stream, or on a harbor of a lake or sea, their powers are usually enlarged, so as to embrace the building of wharves and docks or levees for the benefit of commerce, and they may extend also to the construction of roads leading to it, or the contributing of aid towards their construction. The number and variety of works which may be authorized, having a general regard to the welfare of the city or of its people, are mere matters of legislative discretion. All of them require for their execution considerable expenditures of money. Their authorization without providing the means for such expenditures would be an idle and futile proceeding. Their authorization, therefore, implies and carries with it the power to adopt the ordinary means employed by such bodies to raise funds for their execution, unless such funds are otherwise provided. And the ordinary means in such cases is taxation. A municipality without the power of taxation would be a body without life, incapable of acting, and serving no useful purpose.

For the same reason, when authority to borrow money or incur an obligation in order to execute a public work is conferred upon a municipal corporation, the power to levy a tax for its payment or the discharge of the obligation accompanies it; and this, too, without any special mention that such power is granted. This arises from the fact that such corporations seldom possess — so seldom, indeed, as to be exceptional — any means to discharge their pecuniary obligations except by taxation. "It is therefore to be inferred," as observed by this

court in *Loan Association* v. *Topeka* (20 Wall. 660), "that when the legislature of a State authorizes a county or city to contract a debt by bond, it intends to authorize it to levy such taxes as are necessary to pay the debt, unless there is in the act itself, or in some general statute, a limitation upon the power of taxation which repels such an inference."

The doctrine here stated is asserted by the Supreme Court of Pennsylvania in *Commonwealth* v. *Commissioners of Allegheny County*, 37 Pa. 277. That county was authorized by an act of the legislature to subscribe to the capital stock of a railroad company, and to issue its bonds in payment thereof. The interest on them being unpaid, a writ of *mandamus* was applied for to compel the commissioners of the county to make provision to pay it. The return of the officers set up, among other objections to the writ, that the act authorizing the subscription and issue of the bonds provided no means of payment, either of the principal or interest. To this defence the court said: "The act of 1843 authorized subscriptions by certain counties to be made as 'fully as any individual could do,' without prescribing more precisely the terms. But by the fifth section of the act of April 18, 1843, counties subscribing are authorized to borrow money to pay for such subscriptions. We have decided that bonds or certificates of loan issued by a municipal corporation is an ordinary and appropriate mode of borrowing money, and the act of 1853 expressly authorized the issue of such securities. The subscriptions were accordingly made, and the bonds issued. Thus was a lawful debt incurred by the county; and as no other than the ordinary mode of extinguishing it, or of paying the interest thereon, was provided, it follows, of course, that the ordinary mode of raising the means must be resorted to; namely, to provide for it in the annual assessment of taxes for county purposes." Again, in the same case, the court said: "In the next place, it is averred that there is no authority to levy a tax for the payment of the interest by the county. We have already treated of this, and said that the authority to create the debt implies an obligation to pay it; and when no special mode of doing so is provided, it is also implied that it is to be done in the ordinary way, — by the levy and collection of taxes."

In numerous cases, similar language is found in opinions of the State courts, not required, perhaps, to decide the point in judgment therein, but showing a recognition of the doctrine stated. Thus, in *Lowell* v. *Boston* (111 Mass. 460), the Supreme Court of Massachusetts, in speaking of bonds which the legislature had authorized the city of Boston to issue, in order to raise funds to be loaned to individuals to aid them in rebuilding that portion of the city which was burned in the great fire of November, 1872, said: " The issue of bonds by the city, whatever provision may be made for their redemption, involves the possible and not improbable consequence of a necessity to provide for their payment by the city. The right to incur the obligation implies the right to raise money by taxation for payment of the bonds; or, what is equivalent, the right to levy a tax for the purposes for which the fund is to be raised by means of the bonds so authorized." To the same purport is the language of the Supreme Court of Wisconsin, in *Hasbrouck* v. *Milwaukee*, 25 Wis. 122. And in the recent case of *Parsons* v. *The City of Charleston*, in the United States Circuit Court, the Chief Justice gave emphatic affirmation to the doctrine. Hughes, 282. Indeed, it is always to be assumed, in the absence of clear restrictive provisions, that when the legislature grants to a city the power to create a debt, it intends that the city shall pay it, and that the payment shall not be left to its caprice or pleasure. When, therefore, a power to contract a debt is conferred, it must be held that a corresponding power of providing for its payment is also conferred. The latter is implied in the grant of the former, and such implication cannot be overcome except by express words excluding it.

In the present case, the indebtedness of the city of New Orleans is conclusively established by the judgments recovered. The validity of the bonds upon which they were rendered is not now open to question. Nor is the payment of the judgments restricted to any species of property or revenues, or subject to any conditions. The indebtedness is absolute. If there were any question originally as to a limitation of the means by which the bonds were to be paid, it is cut off from consideration now by the judgments. If a limitation existed, it should have been insisted upon when the suits on the bonds were pend-

ing, and continued in the judgments. The fact that none is thus continued is conclusive on this application that none existed.

If the question were an open one, our conclusion would be the same. The act of 1854 provided that the railroad company should issue to the city certificates of stock for an amount equal to the amount of bonds received; and that the stock should remain " for ever pledged for the redemption of said bonds." It is plain that this language was intended only to create a statutory pledge by way of collateral security for the payment of the bonds. It does not import that the holders of the bonds were to be thereby precluded from looking to the city, or that they were obliged to have recourse, in the first instance, to the pledge. The city, by the terms of the bonds, was primarily liable; and nothing in the language of the act in any respect affects this primary liability. The bondholder is not compelled to look to the security, but may proceed directly against the city without regard to it. Besides, as was justly observed by counsel, if we could seek the intention of the legislature from other considerations than the words of the statute, it would be still plainer that no such construction could be given to its language. The object of issuing the bonds for the stock was to aid the company in obtaining funds to build its road. If the stock had been available, the bonds would not have been needed; the stock would have been sold. But it was not available; and it is difficult to believe that the bonds would have been any more so, if their payment had been limited to the revenues and proceeds of the stock. The proposal of such a scheme for raising money would not have indicated much wisdom on the part of the legislature; to have assented to it would have indicated less on the part of the bondholders. And even if the bondholders had been required to look for payment of the bonds only to the revenues and proceeds of the stock, it comes with bad grace from the city, not to say evinces an insensibility to its obligations, to allege exemption from liability after its authorities have sold the stock and diverted the proceeds to other uses.

This construction is not affected, as contended by counsel, by the statutes of 1852 and 1853, restraining cities and towns from

creating any indebtedness without providing at the same time for the payment of the principal and interest. Those statutes were not limitations on the power of the legislature to authorize the creation of debts by cities upon other conditions. It does not follow that because it was deemed expedient, as a general rule, to prohibit cities and towns from incurring debts on their own motion, without making provision for their payment, that the legislature might not authorize the incurring of a particular obligation without such provision. And it will be found, upon examination, that the act of 1854 prescribed the details of the ordinance which should be passed by the city in the execution of the authority conferred, and that the ordinance passed conformed to them. *Butz* v. *Muscatine*, 8 Wall. 575; *Amey* v. *Allegheny*, 24 How. 364; *Commonwealth* v. *Pittsburg*, 34 Pa. St. 496; *Commonwealth* v. *Commissioners*, 40 id. 348; *Commonwealth* v. *Perkins*, 43 id. 400; *Fosdick* v. *Perrysburg*, 4 Ohio St. 472.

There is nothing, therefore, in the positions of counsel to impair the validity of the bonds upon which the judgments were recovered, if we were at liberty to consider them on this application. But, as already said, the judgments are conclusive upon this point. Owing the debt, the city has the power to levy a tax for its payment. By its charter, in force when the bonds were issued, it was invested, in express terms, " with all the powers, rights, privileges, and immunities incident to a municipal corporation and necessary for the proper government of the same."

As already said, the power of taxation is a power incident to such a corporation, and may be exercised for all the purposes authorized by its charter or subsequent legislation. Whatever the legislature empowers the corporation to do is presumably for its benefit, and may, in " the proper government of the same," be done. Having the power to levy a tax for the payment of the judgments of the relator, it was the duty of the city, through its authorities, to exercise the power. The payment was not a matter resting in its pleasure, but a duty which it owed to the creditor. Having neglected this duty, the case was one in which a *mandamus* should have been issued to enforce its performance. *Knox County* v. *Aspinwall*, 24 How. 376; *Von*

*Hoffman* v. *City of Quincy*, 4 Wall. 535; *Benbow* v. *Iowa City*, 7 id. 313; *Supervisors* v. *Rogers*, id. 175; *The Supervisors* v. *Durant*, 9 id. 415; *County of Cass* v. *Johnston*, 95 U. S. 360.

The judgment of the court below must, therefore, be reversed, and the cause remanded with directions to issue the writ as prayed in the petition of the relator; and it is

*So ordered.*

NOTE. — Three other cases against the city, on the relation respectively of Charles Parsons, of William S. Peterkin, and of James Wadick, were argued at the same time as the preceding case. The city was represented by the same counsel. *Mr. D. H. Chamberlain* and *Mr. William B. Hornblower* appearing for Parsons, and *Mr. Thomas J. Semmes* and *Mr. Robert Mott* for the relator in each of the other cases.

MR. JUSTICE FIELD, in delivering the opinion of the court, remarked, that each of the cases was, in all essential particulars, similar to that of *United States* v. *New Orleans;* and, upon the authority of the decision therein, the judgment below must be reversed, and each cause remanded with directions to issue a writ of *mandamus* to levy and collect a tax, as prayed by the relator, to pay the judgment described in his petition, with lawful interest thereon; and it is

*So ordered.*