# Richmond

NORMAN FARQUHAR, ET AL. V. BOARD OF SUPERVISORS OF
FAIRFAX COUNTY, ETC., ET AL.

June 21, 1954.

Record No. 4320.

Present, All the Justices.

The opinion states the case.

*Neville G. Hall, Jr.,* for the appellants.

*Hugh B. Marsh, Robert J. McCandlish, Jr., Boothe, Dudley, Koontz & Boothe; Hawkins, Delafield & Wood; Mitchell & Pershing; J. Lindsay Almond, Jr., Attorney General* and *Frederick T. Gray, Assistant Attorney General,* for the appellees.

BUCHANAN, J., delivered the opinion of the court.

This is a suit for a declaratory judgment, Code § 8-578, brought by the appellants for themselves and others similarly situated to determine their rights and to have declared invalid a contract between the City of Alexandria, Virginia, Sanitation Authority, herein called the Authority, and Sanitary District No. One of Fairfax County, Virginia (acting through the Board of Supervisors of said county), herein called the District, for the use of certain sewerage facilities proposed to be constructed by the Authority.

The Authority was created and organized under the Virginia Water and Sewer Authorities Act, Acts 1950, ch. 577, p. 1312, amended by Acts 1952, ch. 430, p. 723, Code 1952 Cum. Supp. § 15-764.1 *et seq.*, herein called the Authorities Act. The District was created pursuant to ch. 161, Acts 1926, p. 289, as amended, § 21-113 *et seq.*, Code 1950 and 1952 Cum. Supp.

One of the appellants is a resident and taxpayer of Fairfax county and holder of one of the previously issued sewer bonds of the District; another is a resident and taxpayer of the District and a user of the sewerage system of the District, and the third is a resident and taxpayer of the city of Alexandria and user of the sewerage system of the city.

The Authority and the District were made parties defendant to the appellants' bill and filed answers. The State Water Control Board filed a petition asking to be made a party defendant and setting forth that since 1951 it had endeavored to obtain action by the responsible political subdivision toward the control and abatement of pollution of State waters and was vitally interested in the validity of the Authority and of the contract, both of which had a direct and substantial bearing on the future efforts of the Board to carry out its duties under the State Water Control Law, Code § 62-10 *et seq.* The petition was granted and the State Water Control Board filed its answer.

The facts are not in dispute but were admitted by the pleadings and it was stipulated that the pleadings raise all constitutional questions as to the Authorities Act.

In 1951 the State Water Control Board, having found that serious pollution existed in State waters into which the city of Alexandria discharged untreated sewage, ordered the city to take measures to abate and prevent that condition. The city pressed its engineering and sanitation studies and other efforts toward the construction of the necessary physical facilities, and the Authority, which is subject to the jurisdiction of the State Water Control Board (Code § 15-764.30) was duly created for the purpose of acquiring, constructing, improving, extending, operating and maintaining a sewer system and a sewage disposal system and for the purpose of exercising the powers conferred by the Authorities Act.

The county of Fairfax had for some years likewise been engaged in engineering studies of sewage disposal problems, and in 1943 Sanitary District No. One had been duly created, comprising for the most part the area of the county contiguous to the city. The governing body of the District is the Board of Supervisors of the county. The District operates a sewer and sewage disposal system which, because of population growth, is inadequate for the present and future needs of the District. This system was financed in part by the issuance of $3,000,000 of bonds of the District in 1950.

The engineering studies on behalf of the city and county indicated that a large saving in both capital and annual cost could be effected if a sewage disposal system was constructed to serve the needs of the city and also the additional needs of the District. According to the engineering reports the cost of constructing separate facilities for the city would be approximately $7,775,000, while the cost of separate additional facilities for the District would be approximately $4,431,000. The cost of the combined sewage disposal system would be approximately $10,408,000, representing a saving of approximately $1,798,000 in capital cost, as well as a large annual saving in operating and debt service costs. The preparation of detailed designs, plans,

specifications and contract documents for the combined facilities was accordingly authorized.

Thereafter the Authority and the District entered into the contract above referred to, dated November 16, 1953, a copy of which, together with the engineering report which is made a part thereof, was exhibited with the appellants' bill, and which is herein called the Contract. It contains the following provisions and agreements pertinent to the present controversy:

The Authority agrees (1) to use its best efforts to sell its revenue bonds to be issued under the provisions of the Authorities Act in an amount sufficient to pay the cost of constructing and placing in operation the Sewage Disposal System recommended in the engineering report and thereupon will proceed to construct the system; (2) to receive for treatment and disposal for so long as the Sewage Disposal System is in existence sewage originating in the District or areas contiguous and contributory thereto or in any other areas of Fairfax county for the disposal of which the District had contracted or may hereafter contract, not to exceed prescribed limitations.

The District agrees to use the Sewage Disposal System and until it shall have made payment to the Authority of the Total Base Amount, as defined in the Contract, to use no competitive facilities except such as used by or under construction for the District at the Contract date, and such as needed by the District other than those required to be furnished by the Authority.

The Authority and the District mutually agree:

(1) All payments for services made by the District shall be payable solely from revenues received by the District from users of the District system utilizing the services of the Sewage Disposal System, available to the District for such purposes in the fiscal year of the District in which the services are rendered, and the District agrees to collect from such users rates of charge sufficient to make such payments.

(2) For each 12 months' period in which the District

utilizes the services of the Sewage Disposal System, the District shall pay to the Authority as compensation for services furnished by the Authority under the Contract (a) an amount, called the Base Amount, equal to the annual payment necessary to discharge a debt in the amount of the District cost (cost of constructing the facilities to be used by the District) due in 25 years and bearing interest equal to the net interest cost on the revenue bonds to be issued by the Authority; and (b) an amount equal to that portion of the total cost of operation and maintenance of the Sewage Disposal System properly allocable to the portion thereof used by the District.

(3) The Contract is to continue in effect without termination except that after the District has paid the Total Base Amount (the annual Base Amount multiplied by 25) the District shall not be obligated to pay any charge for the future use of the facilities other than that referred to in (b) next above.

In the decree appealed from the trial court held that the Contract is a valid agreement and enforceable according to its terms; that the Authorities Act is a valid enactment and that the proposed revenue bonds of the Authority when issued in accordance with the terms of that Act will be valid. The appellants make six assignments of error to that decree, based on grounds presented to and specifically overruled by the trial court. We deal with them in the order in which they were argued.

I. It is said that the court erred in holding that the obligation of the District under the Contract does not create a debt within the meaning of § 115a of the Constitution of Virginia. That section provides that no debt shall be contracted by any county or district thereof, or by any school board or school district, except under authority conferred by general law, and such authority shall not be conferred without providing for an election on the question of contracting the debt, unless the debt be (1) to meet casual deficits in the revenue; (2) created in anticipation of the

collection of the revenue of such county, district or board for the then current year, or (3) to redeem a previous liability.

Appellants argue that the contract obligates the District to pay a certain Base Amount of the cost of the Sewage Disposal System, plus interest, every year for 25 years, whether the System is used by the District or not, and if used, the District must also pay its share of the annual operation and maintenance costs; all without an election on the question of contracting those obligations. The answer to the constitutional aspect of that contention is found in paragraph 1 of Article III of the Contract, copied in the margin,[1] the substance of which is stated above.

In *Almond* v. *Gilmer*, 188 Va. 822, 51 S. E. (2d) 272, the validity of the State Revenue Bond Act (Acts 1940, ch. 399, p. 711) was in question which authorized the State Highway Commission to acquire or construct and operate certain bridges and ferries, to be financed by revenue bonds of the State, payable solely from earnings derived from tolls and other charges for the use of the projects. It was claimed that the act violated § 184a of the Constitution of Virginia, which provides that no debt or liability, with exceptions not here pertinent, shall be contracted by or in behalf of the State unless authorized by law for some single purpose constituting new capital outlay, and no such law shall take effect until approved at a general election.

We held that the Act and the revenue bonds proposed to be issued thereunder imposed no debt or liability on the

---

[1] "All payments made by the District to the Authority for services provided by the Authority hereunder shall be payable *solely from revenues received by the District as the proceeds of rates of charge to be paid by the users of the District System* utilizing the Services of the Sewage Disposal System, *available to it for such purposes in the fiscal year of the District in which such services shall be rendered,* and the District covenants and agrees that it will fix and collect from the users of the District System who also utilize the services of the Sewage Disposal System, rates of charge sufficient to make the payments required to be made for services furnished by the Authority under this Agreement." (Emphasis added).

State and the validity of the bonds was sustained under the special fund doctrine, which is that " 'obligations payable solely from a special fund derived from the revenue of the enterprise for which such obligations are issued do not constitute a bond or a debt within the meaning of any such constitutional limitation or provision.' " 188 Va. at p. 844, 51 S. E. (2d) at p. 281. It was also said that "With well-nigh complete uniformity the decisions approving the doctrine also hold that an undertaking to maintain rates sufficient to defray and liquidate the purchase price of the enterprise payable solely from the income does not give rise to an indebtedness within the purview of the limitations. 146 A. L. R. 341." 188 Va. at p. 843, 51 S. E. (2d) at p. 281.

In the case of *Laverents* v. *City of Cheyenne*, (1950), 67 Wyo. 187, 217 P. (2d) 877, it is said that apparently the first case recognizing the special fund doctrine was *In re Canal Certificates*, 19 Colo. 63, 34 P. 274, decided in 1893, and that since that time the rule has been upheld in more than 200 cases from 33 different jurisdictions. See also Annotations 72 A. L. R. 687, 96 A. L. R. 1385, 146 A. L. R. 328.

The rule so followed in *Almond* v. *Gilmer*, *supra*, does not conflict with the statement in the older case of *American-LaFrance* v. *Arlington County*, 164 Va. 1, 178 S. E. 783, that the Constitution and statutes of this Commonwealth prohibit any Board of Supervisors from incurring any debt for any purpose which is not payable out of the current revenues without approval in an election. The debt there involved was one running over a period of years and payable from the general tax funds. The special fund doctrine is not applicable unless the creditor must look for payment to the special fund alone; if the political entity is made generally liable, then an indebtedness is created within the debt limitations of the Constitution. 38 Am. Jur., Municipal Corporations, § 468, p. 150; 15 McQuillin, Municipal Corporations, 3d ed., § 41.31, p. 364.

Under the Contract the obligations assumed by the District are "payable solely from revenues received by the District" from charges paid by the District users and "available to it [the District] for such purposes in the fiscal year of the District in which such services shall be rendered." They are obligations not forbidden to the District by § 115a of the Constitution. *Cf. Williams* v. *Samuel*, 332 Pa. 265, 2 A. (2d) 834; *Gemmill* v. *Calder*, 332 Pa. 281, 3 A. (2d) 7; *County Drain Commissioner* v. *City of Royal Oak*, 306 Mich. 124, 10 N. W. (2d) 435.

II. It is alleged that the court erred in holding that the annual payments under the Contract are fair and equitable and do not violate the Virginia Constitution. Appellants' brief does not designate the sections of the Constitution thus claimed to be violated, but makes the charge that the annual payments to be made by the District under the Contract are not related to the services required by the District and are greatly in excess of the value of such services. Appellants' bill charges a resulting violation of §§ 6, 11 and 58 of the Constitution which provide, among other things, that there shall not be taxation without representation, or depriving of private property without due process of law, or taking or damaging of private property for public uses without just compensation.

Nothing is pointed out in the record and we can find nothing there which shows that this holding of the court was erroneous or that the sections of the Constitution are in any way invaded. Merely to allege that the payments to be made by the District are unfair and inequitable is not to establish the fact. The Contract recites that the existing facilities in the District, as well as in the city, are inadequate; that the situation constitutes a serious health menace in both areas and creates an imperative need for the additional facilities provided for in the Contract. There is to be a joint use of those facilities as long as they remain in existence and operation. To bring them into being involves the cost of construction and to keep them usable involves

the cost of maintenance and operation. These costs are to be borne by those who are served and it does not appear to be unfair or inequitable to provide, as the Contract does, that those served in the District shall bear their proportion of construction costs along with their proportion of maintenance and operation costs. The allocation to the city and District of project costs and of total annual costs is set forth in the engineering report approved by the engineers of the District and accepted as fair and reasonable by the District authorities. Evidence that the result is unfair or inequitable is entirely wanting.

The Authorities Act itself requires that rates, fees and charges shall be so fixed and revised as to provide funds, with other funds available, sufficient to pay maintenance and operating costs and to pay the principal and interest of the revenue bonds issued to finance the enterprise. We agree with the argument of the appellees that "The mere fact that a portion of the rate base is related to an annual amount sufficient to amortize a proportionate part of the capital investment does not in any way justify a conclusion that the payment of charges computed upon such a principle are not related to the services required by the District or that such charges are in excess of the value of such services." *Cf. Carson* v. *Brockton Sewerage Commission*, 182 U. S. 398, 21 S. Ct. 860, 45 L. ed. 1151; *State* v. *City of Miami*, 157 Fla. 726, 27 So. (2d) 118; *Patterson* v. *City of Chattanooga*, 192 Tenn. 267, 241 S. W. (2d) 291; *Morse* v. *Wise*, 37 Wash. (2d) 806, 226 P. (2d) 214; *Roanoke* v. *Fisher*, 193 Va. 651, 70 S. E. (2d) 274.

III. It is charged that it was error to hold that the Contract does not violate the terms of the District's 1950 bond resolution. That resolution was adopted pursuant to an election duly held and authorized the acquisition and construction of a comprehensive sewerage system in the District, referred to herein as the Sewerage System or as the System, and provided for the issuance of $3,000,000 of sewer bonds to aid in financing the enterprise. Appellants

64

contend that the Contract violates § 7[2] and § 21[3] of that resolution and thereby impairs the District's obligation to the bondholders.

It is sufficiently obvious that the Contract conflicts in no way with § 7. Section 21 standing alone appears to give some support to appellants' contention, but when all the provisions of the resolution are read and considered we do not think that the obligation of the District to the holders of the 1950 bonds is impaired by the Contract.

Section 9 of the resolution provides that reasonable sewerage charges will be collected for the services and facilities furnished by the Sewerage System and that all revenues from the operation of the System shall be deposited by the county treasurer as received to the credit of a special fund called the Revenue Fund.

In § 10 of the resolution two other special funds are created, one called the Sinking Fund and the other called the Maintenance and Extension Fund. Within the Sinking Fund are created three separate accounts called the Bond Service Account, the Reserve Account and the Redemption Account. The county treasurer is required on or before the 20th day of each month to withdraw from the Revenue Fund all money to the credit of that fund on the last day of the preceding month, "less an amount equal to the amount expended in the last three preceding months for ordinary maintenance, repair and operation of the Sewerage System." The sum so withdrawn is to be credited, first, to the Bond

[2] "Section 7. For the prompt payment of the principal of and the interest on the bonds authorized by this resolution as the same shall fall due, the full faith, credit and taxing power of Sanitary District No. One, of Fairfax County, Virginia, are hereby irrevocably pledged."

[3] "Section 21. The Board of Supervisors covenants that, until the bonds issued hereunder and the interest thereon shall have been paid or provision for such payment shall have been made, it will not sell, lease or otherwise dispose of or encumber the Sewerage System or any part thereof and will not create or permit to be created any charge or lien on the revenue of the Sewerage System ranking equally with or prior to the charge or lien on such revenues of the bonds issued under and secured by this resolution. * * * ."

Service Account, sufficient to make the amount then to the credit of that Account equal to the principal amount of all bonds payable in the next 12 months and six months' interest on all outstanding bonds; second, to the Reserve Account, sufficient to make the deposit to that Account in the then fiscal year equal to $30,000, but only enough to bring that Account up to $150,000; third, to the Maintenance and Extension Fund, enough to bring that fund to $150,000, and, fourth, to the Redemption Fund. These payments are to be made in the order stated and conditioned upon there being a sufficient balance after one payment to make the next.

All moneys in the Sinking Fund are to be applied to the payment of the principal of and interest on the bonds. Moneys in the Maintenance and Extension Fund are to be used to pay the cost of unusual or extraordinary maintenance or repair or for extensions, enlargements or improvements of the System.

Nevertheless, § 14 of the resolution[4] levies on all the property in the District, subject to local taxation, a tax sufficient to provide an amount equal to the total principal and interest of all bonds to become due in the ensuing fiscal year, plus the amount required to be deposited in the Re-

---

[4] "Section 14. In each fiscal year while any of said Sewer Bonds shall be outstanding there shall be and there is hereby levied upon all property in said Sanitary District No. One subject to local taxation a tax sufficient to provide an amount equal to the total of the principal of all maturing bonds and the interest on all bonds then outstanding which will become due and payable in the ensuing fiscal year plus the amount required to be deposited to the credit of the Reserve Account under the provisions of clause (b) of Section 10 and the provisions of Section 11 of this resolution in such ensuing fiscal year; provided, however, that the amount of such tax may be reduced for any fiscal year by the total of the amounts withdrawn or reasonably expected to be withdrawn from the Revenue Fund and deposited to the credit of the Bond Service Account and the Reserve Account in the preceding fiscal year under the provisions of clauses (a) and (b) of said Section 10 and the provisions of said Section 11; * * * . The proceeds of such tax shall be deposited to the credit of the Bond Service Account and the Reserve Account to the extent required to make up any deficiency or any anticipated deficiency in said accounts, and the balance of such proceeds shall be deposited to the credit of the Redemption Account."

serve Account, as above; but provides that the amount of such tax *may be* reduced for any fiscal year by the total amounts withdrawn or reasonably expected to be withdrawn from the Revenue Fund for the Bond Service and Reserve Accounts under § 10 above.

In § 15 it is covenated that the sewerage charges collected shall at all times be sufficient, "with other available funds," to provide for the expenses of maintenance, repair and operation of the System and to make the deposits required by § 10 to the Bond Service Account and the Reserve Account and not less than $30,000 in each fiscal year to the Maintenance and Extension Fund.

From these provisions it appears that the revenues from the Sewerage System are to be applied, first, to ordinary maintenance, repair and operation; second, to the Sinking Fund for bond payment, and third to the Maintenance and Extension Fund. But the underlying and fixed security for the payment of the bonds is the property tax levied in § 14 of the resolution, which may be, but is not required to be, reduced by the amounts from the Revenue Fund. The bonds themselves recite that "provision has been made for the levy and collection of an annual tax upon all the property in said District subject to local taxation sufficient with other available funds to pay the principal of and the interest on this bond as the same shall fall due." The covenant of the District is that the sewerage charges shall be sufficient, *with other available funds,* to meet the bond obligations. Other funds are made available by the taxation of the property in the District in an amount sufficient to pay the principal and interest of all bonds maturing in the ensuing year. The use of tax money rather than money from the sewer revenues will not impair the obligation of the District to its bondholders.

Moreover, under the terms of the bond resolution, revenues from the Sewerage System are applicable first to ordinary maintenance, repair and operation of the System. It appears as a fact that the Sewerage System does not now provide

adequate collection or treatment facilities for the sewage received by its collection system. The project provided for in the Contract is designed to afford relief from this inadequacy; in other words, to remedy operational defects or deficiencies in the present system, and in that sense to incur an ordinary operating expense to which the revenues from the present system are directed by the resolution to be first applied. *Cf.* George v. *City of Asheville,* 80 F. (2d) 50.

The trial court correctly decided that the Contract does not impair the obligation of the District to its bondholders.

■ IV. It is alleged that the District and the Authority had no legal authority to enter into the Contract. The applicable statutes refute that contention.

Chapter 161, Acts 1926, *supra,* in paragraph 3 (g), at p. 290, Code 1950, § 21-118(8), invests the District with power to "contract with any person, firm, corporation or municipality" for the connection of its sewerage system with any other system either then in operation or thereafter established, and with regard to any other matter necessary and proper for the construction, maintenance and operation of the District System. The Authority is a corporation, Code, 1952 Cum. Supp., § 15-764.12, and is given power, among other things, to enter into contracts with the Commonwealth, or any agency or instrumentality thereof, or with any unit, relating to the furnishing of services and facilities of any sewer system or sewage disposal system.

By § 15-764.31 each county, municipality and other public body is authorized to contract with any Authority for the collection, treatment or disposal of sewage. In *Hampton Roads San. Dist.* v. *Smith,* 193 Va. 371, 68 S. E. (2d) 497, a sanitation district was held to be a municipal corporation within the meaning of § 8-462(a)(vi) of the Code. In the Authorities Act "unit" means, among other things, any public corporate instrumentality of the Commonwealth, any district, and includes counties and municipalities, § 15-764.2; and the Authority is "a public body politic and corporate." § 15-764.3.

V. Appellants charged that the revenue bonds proposed to be issued by the Authority will constitute bonds of and the incurring of a debt by the city of Alexandria and will violate § 127b of the Constitution of Virginia because not approved in an election.

The Authority created under the provisions of the Authorities Act is authorized to issue revenue bonds to pay all or part of the cost of a sewage disposal system, the principal and interest of which shall be payable solely from the funds as provided in the Act. Code § 15-764.14.

Section 15-764.19 provides that such revenue bonds shall not constitute a pledge of the faith and credit of the Commonwealth or of any political subdivision thereof, and shall state on their face that neither the faith and credit of the Commonwealth nor the faith and credit of any county, city, town or other subdivision thereof are pledged to the payment of the principal of or interest on such bonds, and such bonds shall not directly or indirectly or contingently obligate the Commonwealth or any county, city, town or other subdivision thereof to levy any taxes therefor or make any appropriation for their payment except from the funds pledged under the provisions of the Act.

The Authority is authorized to fix and revise rates, fees and other charges for the use of and for the services furnished by the sewage disposal system so as to provide funds, with other funds available for such purposes, sufficient at all times to pay the cost of maintaining, repairing and operating the system and to pay the principal of and interest on the revenue bonds as the same shall become due and reserves therefor, with a margin of safety for making such payments. § 15-764.22.

It is clear that the bonds proposed to be issued by the Authority are not bonds of the city, and in their issuance no debt will be incurred by the city. Hence, their issuance in no way comes within the purview of § 127b of the Constitution requiring an election to approve bonds of a city or town which exceed the debt limitation prescribed by that

section. It was so decided with respect to bonds of a Housing Authority issued under similar provisions of the Housing Authorities Law, Code § 36.1, *et seq.*; *Mumpower* v. *Housing Authority,* 176 Va. 426, 11 S. E. (2d) 732. See also *Williams* v. *Samuel, supra,* 332 Pa. 265, 2 A. (2d) 834; *Gemmill* v. *Calder, supra,* 332 Pa. 281, 3 A. (2d) 7; *Robertson* v. *Zimmermann,* 268 N. Y. 52, 196 N. E. 740.

Appellants argue that this conclusion is at variance with the holdings in *Galax* v. *Appalachian E. P. Co.,* 177 Va. 29, 12 S. E. (2d) 778, and *Town of South Hill* v. *Allen,* 177 Va. 154, 12 S. E. (2d) 770. We do not think so. In the *Galax* case, as pointed out by Mr. Justice Spratley in his dissent in the *South Hill* case, the bonds were "proposed to constitute an indebtedness of the town for which its property can be taken in default of payment and, in this sense, they are a form of indebtedness, although limited to repayment from a specific asset." 177 Va. at p. 168, 12 S. E. (2d) at pp. 775-6.

In the *South Hill* case the indebtedness proposed to be incurred was evidenced by "obligations of the town," although payable solely from the net receipts from the property to be purchased. As there said in the majority opinion, "the power of a municipality, unlike that of the state legislature, must be exercised pursuant to an express grant, * * *." 177 Va. at p. 163, 12 S. E. (2d) at p. 773. Here the city issues no bonds and incurs no debt. The bonds are to be issued by an agency of the State created by legislative act and are to be paid from revenues of the project. Their issuance adds no burden to the taxpayers and creates no charge for which taxes could be levied. The holding in the *South Hill* case is limited to its particular facts.

■ VI. Finally, it is contended that the Authorities Act is unconstitutional and that the trial court erred in holding to the contrary.

It is said first that the Act vests in the Authority the power to issue bonds which would ordinarily be a function of the city, committed to it by § 7:15 of its charter, and as

to the issuance of which § 127b of the Constitution requires an election. This contention is sufficiently dealt with immediately above.

It is argued secondly that the Authorities Act is an improper delegation of legislative power and hence violates § 5 of the Virginia Constitution, which declares that the legislative, executive and judicial departments of the States should be kept separate and distinct. We see in the Act no breach of that injunction. As pointed out in the *Mumpower* case, § 63 of the Constitution provides that the authority of the General Assembly shall extend to all subjects of legislation not forbidden or restricted by the Constitution. Not only is there nothing in that instrument which limits or restricts the legislative power to create such a State agency as the Alexandria Sanitation Authority, but § 147 of the Constitution directs that such sanitary and other named institutions as the claims of humanity and the public good may require shall be established and operated by the Commonwealth under such organization and in such manner as the General Assembly may prescribe.

Lastly it is contended that the enforcement of sewerage connections, the collection of charges and the creation of a lien therefor as provided by §§ 15-764.23, 15-764.24 and 15-764.25 may deprive landowners of their property without due process of law. These sections provide that the owner, tenant or occupant of a parcel of land upon which is a building for residential, commercial or industrial use, which parcel abuts upon a street containing a sanitary sewer which is part of or served by the sewer system, may be required, with the consent of the local government, to connect his building with the sewer and cease to use any other method of sewage disposal. If the charges for the use of the system are not paid within 30 days after becoming due, the Authority may disconnect the premises from the water and/or sewer system, or otherwise suspend services and recover the amount due in a civil action. It is provided that there shall be a lien upon the real estate served by the sewer

system for unpaid charges which shall be superior to the interest of the owner, lessee or tenant, which, however, shall not affect a subsequent purchaser for value without notice except from the time the lien is recorded.

Such provisions are necessary implements of a sanitary system constructed and operated by an agency of the State which was created and organized for the public good pursuant to § 147 of the Constitution, and, as declared in § 15-764.12 "exercising public and essential governmental functions to provide for the public health and welfare." We hold the provisions in question to be constitutional as being a reasonable exercise of the police power of the State and bearing a substantial relation to the protection and preservation of the public health. 39 C. J. S., Health, § 2, p. 811, § 21 at p. 835; 25 Am. Jur., Health, § 3, p. 287. Like provisions have been frequently upheld against the charge of being an invasion of constitutional rights. *State* v. *City of Miami, supra,* 157 Fla. 726, 27 So. (2d) 118; *Anderson* v. *City of Fargo,* 64 N. D. 178, 250 N. W. 794; *Robertson* v. *Zimmermann, supra,* 268 N. Y. 52, 196 N. E. 740; *Patterson* v. *City of Chattanooga, supra,* 192 Tenn. 267, 241 S. W. (2d) 291; *City of Maryville* v. *Cushman,* 363 Mo. 87, 249 S. W. (2d) 347; *Michelson* v. *City of Grand Island,* 154 Neb. 654, 48 N. W. (2d) 769; 26 A. L. R. (2d) 1346, and Anno. at p. 1359.

The judgment of the trial court is

*Affirmed.*

SPRATLEY, J., concurs in result.