48 Cal.2d 93 (1957)
CITY OF GLENDALE, Appellant,
v.
CHRISTINE TRONDSEN, Respondent.
L. A. No. 24116. 
Supreme Court of California. In Bank. 
Mar. 12, 1957.
 Henry McClernan, City Attorney, John H. Lauten, Assistant City Attorney, and Joseph W. Rainville, Deputy City Attorney, for Appellant.
 Roger Arnebergh, City Attorney (Los Angeles), Bourke Jones and James A. Doherty, Assistant City Attorneys, and Moses A. Berman, Deputy City Attorney, as Amici Curiae on behalf of Appellant.
 Jack B. Tenney and Cecil W. Collins for Respondents.
 CARTER, J.
 Plaintiff, a chartered city, enacted an ordinance pertaining to rubbish. It provides that rubbish includes *96 combustible and noncombustible material. [fn. *] Every person having "charge or control" of any place where any rubbish accumulates shall cause it to be placed in specified receptacles and shall not permit it to accumulate for over certain periods of time (combustible -- one week; noncombustible -- one month). The city shall provide for its collection at certain intervals. No person who pays the "minimum charge for collection" shall set out for collection more than a specified quantity; if additional quantities are to be collected, extra charge shall be made. By section 8 the city council "... finds that the periodic collection of rubbish from all places in the City benefits all occupants of places and premises in the City ... and therefore all such occupants are made liable for the rubbish collection fees prescribed by this ordinance." (Ordinance 1764, 8.) There are then set forth a schedule of "fees" varying according to the nature of the use of the premises occupied, such as 75 cents per month for "single family dwellings," and a different amount for apartments or places of business. The fees are added to the electric light bills of the occupant. Extra charges are made for rubbish in excess of the amounts specified. "A fee imposed by ... [the] ordinance shall be a civil debt owing to the City ... from the occupant of the property receiving the service." ( 9(e).) Compliance with the ordinance necessary to procure the collection and removal thereof shall be a defense to any prosecution for failure to remove or dispose of rubbish. A violation of the ordinance shall be a misdemeanor punishable as specified.
 The plaintiff city commenced three actions which were considered together on demurrer against each of three persons for the several months that they had not paid the charge *97 levied by the ordinance. It is alleged that the person named as defendant occupied a single-family residence in the city; during his term of occupancy defendant "enjoyed the use and occupancy of the said premises and the privilege of the use, accumulation, and storage of combustible and noncombustible rubbish and refuse thereon"; that plaintiff's agents have called regularly at the homes of defendant to collect rubbish "to the general benefit of the community at large in the prevention of unhealthful conditions, the lessening of fire hazard and the diminution of the presence of air pollutants (smog) in said City." The charges made under the ordinance have not been paid. There is no allegation that defendants had any rubbish to be collected or that any was collected from them. Defendants' general demurrers for failure to make such allegations were sustained with leave to amend but plaintiff failed to amend and judgments of dismissal of the actions were entered. Plaintiff appeals.
 Plaintiff contends that the rubbish ordinance is both a police and taxing measure and valid in both respects; that the tax portion does not violate the city charter. Defendants assert that the charge made against occupants is not a valid tax nor special assessment, property, excise or license tax, nor is it a proper charge for police regulation; that it is for the service of having rubbish removed and there is no allegation here that any rubbish was removed from their property by plaintiff. If it is a tax of any kind it is on the occupancy of property and beyond the power of the city to levy under its charter.
 No contention is made by plaintiff that it is a property tax and hence possibly subject to the provisions of the Constitution on property taxation. [fn. *] Nor is there any contention that it is a special assessment levied on property according to the benefits received from the use of the money thereby raised, or license tax for revenue or regulation. It is not claimed that the charge is for services performed, that is, the collection of rubbish, inasmuch as there is no allegation in the complaint that any rubbish was collected from defendants and the charge fixed by section 8 of the ordinance, supra, applies generally to all occupants whether or not rubbish is collected, although it is alleged that the service was available to defendants who enjoyed the privilege of using the premises *98 for the accumulation of rubbish and plaintiff's agent has regularly called for rubbish at the premises occupied by defendants.
 [1] The levy and collection of taxes by a city having a charter under our Constitution is a municipal affair. The power is broad, being limited only by the charter and the Constitution. (Fox etc. Corp. v. City of Bakersfield, 36 Cal. 2d 136 [222 P.2d 879].) It is said in Ainsworth v. Bryant, 34 Cal.2d 465, 469 [211 P.2d 564]: "It is well settled that the power of a municipal corporation operating under a freeholders' charter ... to impose taxes 'for revenue purposes, including license taxes, is strictly a municipal affair' pursuant to the direct constitutional grant of the people of the state (Const., art. XI, 6; West Coast Advertising Co. v. San Francisco, 14 Cal.2d 516, 524 [95 P.2d 138]), and that 'the restrictions on the exercise of that power are only the limitations and restrictions appearing in the Constitution and in the charter itself.' (Ibid, p. 526.) So it was said in the earlier case of Ex parte Braun, 141 Cal. 204, at pages 209-210 [74 P. 780], quoting from Mr. Justice Field in United States v. New Orleans, 98 U.S. 381 [25 L.Ed. 225]: 'A municipality without the power of taxation would be a body without life, incapable of acting, and serving no useful purposes. ... When such a corporation is created, the power of taxation is vested in it, as an essential attribute, for all the purposes of its existence, unless its exercise be in express terms prohibited. For the accomplishment of these purposes, its authorities, however limited the corporation, must have power to raise money and control its expenditure.' " (Emphasis added.) [2] And further: "... that by accepting the privilege of autonomous rule the city has all powers over municipal affairs, otherwise lawfully exercised, subject only to the clear and explicit limitations and restrictions contained in the charter. [3] The charter operates not as a grant of power, but as an instrument of limitation and restriction on the exercise of power over all municipal affairs which the city is assumed to possess; and the enumeration of powers does not constitute an exclusion or limitation. (West Coast Advertising Co. v. San Francisco, 14 Cal.2d 516, 521-522, 525 [95 P.2d 138] and cases cited; City of Oakland v. Williams, 15 Cal.2d 542, 550 [103 P.2d 168]; San Francisco v. Boyd, 17 Cal. 2d 606, 617-618 [110 P.2d 1036]; Kennedy v. Ross, 28 Cal.2d 569, 575 [170 P.2d 904]; Ayres v. City Council of Los Angeles, ante, pp. 31, 37 [34 Cal.2d] [207 P.2d 1]. [4] Thus *99 in respect to municipal affairs the city is not subject to general law except as the charter may provide. (Heilbron v. Summer, 186 Cal. 648, 650 [200 P. 409]; Muehleisen v. Forward, 4 Cal.2d 17, 19 [46 P.2d 969].) [5] As recognized in the West Coast Advertising case, the levy of taxes for city purposes is a municipal affair; the collection, treatment and disposal of city sewage and the making of contracts therefor are likewise municipal affairs (Loop Lumber Co. v. Van Loben Sels, 173 Cal. 228, 232 [159 P. 600]), and neither may be held to be circumscribed except as expressly limited by the charter provisions. [6] All rules of statutory construction as applied to charter provisions ... are subordinate to this controlling principle. The former guide--that municipalities have only the powers conferred and those necessarily incident thereto. ... A construction in favor of the exercise of the power and against the existence of any limitation or restriction thereon which is not expressly stated in the charter is clearly indicated. So guided, reason dictates that the full exercise of the power is permitted except as clearly and explicitly curtailed. Thus in construing the city's charter a restriction on the exercise of municipal power may not be implied." (Emphasis added; City of Grass Valley v. Walkinshaw, 34 Cal.2d 595, 598-599 [212 P.2d 894].)
 [7] It is not necessary, therefore, that there be specific authority for the charge (the nature of the charge is discussed later) here levied. By virtue of its power as a chartered city plaintiff has power to make it unless it is expressly denied such power by the charter or Constitution.
 [8] Defendants assert that there are such limitations in the charter. Section 12 of article XI thereof provides that whenever the city council determines that public interest requires an expenditure for a municipal purpose which cannot be provided out of the ordinary city revenue, it "may" submit to the voters a proposition providing for a "special tax" or the issuing of bonds. No election was held for the adoption of the ordinance in question. This contention is correctly met by City of Glendale v. Crescenta etc. Water Co., 135 Cal.App.2d 784, 798 [288 P.2d 105], where it is pointed out that an excise tax may be imposed without a vote as section 12 of article XI referred only to property taxes, the court stating: "Respondent asserts a violation of section 12, article XI of the charter, claiming this is a special tax which is invalid for failure to submit to the electors. That section must be construed in the light of related provisions. Section *100 11 says: 'The total tax rate for any one year shall not exceed one per cent of the assessed valuation, unless a special tax be authorized, as provided in this chapter; ...' And section 12: 'Whenever the Council shall determine that the public interest demands an expenditure for municipal purposes, which cannot be provided for out of the ordinary revenue of the City, it may submit to the qualified voters at a regular or special election, a proposition to provide for such expenditure, either by levying a special tax, or by issuing bonds, but no such special tax shall be levied nor any such bonds issued, unless authorized by the affirmative votes of two-thirds of the electors voting at such election.' ... Sections 9, 10 and 11 are so worded as to refer exclusively to ad valorem property taxes. Section 11 says in effect that the basic rate of one per cent of assessed valuation may be increased to the extent of a special tax voted by the people. This could mean only a property tax. Section 12 implements the phrase of 11, 'unless a special tax be authorized, as provided in this charter; ...' It does so by submitting to the voters at a general or special election a proposal to provide for an expenditure which ordinary revenues cannot meet--to provide for same 'either by levying a special tax, or by issuing bonds'; same must be approved by two-thirds vote. Section 22 of the same article authorizes payment, at the election of the council, of all or any part of the Metropolitan tax out of the public service surplus fund. This was done by amendment in 1941, later than the passage or amendment of section 11 or section 12. It would be unduly straining the meaning of section 12 to hold that it requires a special election to raise funds for any part of the Metropolitan tax which is not to be paid out of the surplus fund. Section 12 relates only to property taxes."
 [9] Defendants also point to section 6 of article XXIII of the charter. [fn. *] Obviously this is nothing more than a permissive *101 method by which rubbish may be required to be removed and not a limitation on other methods when we consider the nature of the power of chartered cities as shown by the Ainsworth and Walkinshaw cases and other cases and authorities cited therein.
 Defendants' chief contention is that the charge made by the ordinance is not a tax but merely a fee for services rendered and that since it is not alleged that they received the services, the complaint fails to state a cause of action; that a charge for services not rendered is invalid presumably as a taking of property without due process of law.
 [10] It is not questioned that provisions with respect to rubbish are a proper exercise of the police power (see In re Zhizhuzza, 147 Cal. 328 [81 P. 955]; California Reduction Co. v. Sanitary Reduction Works, 199 U.S. 306 [26 S.Ct. 100, 50 L.Ed. 204]; In re Pedrosian, 124 Cal.App. 692 [13 P.2d 389]; Glass v. City of Fresno, 17 Cal.App.2d 555 [62 P.2d 765]; Ponti v. Burastero, 112 Cal.App.2d 846 [247 P.2d 597]; Davis v. City of Santa Ana, 108 Cal.App.2d 669 [239 P.2d 656]). The power of the city to pass police regulations on the subject of rubbish being clear, we must look to see if there is any constitutional objection to the charge here imposed. The case is analogous to the requirement by a city that all premises connect with the city sewer system at the expense of the property owners or making a charge therefor even though the premises have other adequate sewer facilities. There is no constitutional objection to such a requirement. (See Sanitation Dist. No. 1 of Jefferson County v. Campbell, ___ Ky. ___ [249 S.W.2d 767]; District of Columbia v. Brooke, 214 U.S. 138 [29 S.Ct. 560, 53 L.Ed. 941]; Hutchinson v. City of Valdosta, 227 U.S. 303 [33 S.Ct. 290, 57 L.Ed. 520]; Farquhar v. Board of Supervisors, 196 Va. 54 [82 S.E.2d 577]; Fenton v. Atlantic City, 90 N.J.L. 403 [103 A. 695].) And the same is true of a city water system to which premises must connect and pay the rates although they have other water supplies. Weber City Sanitation Com. v. Craft, 196 Va. 1140 [87 S.E.2d 153].) It is said in Farquhar v. Board of Supervisors, 196 Va. 54 [82 S.E.2d 577, 587]: "Lastly it is contended that the enforcement of sewerage connections, the collection of charges and the creation of a lien therefor ... may deprive landowners of their property without due process of law. These sections provide that the owner, tenant or occupant of a parcel of land upon which is a building for residential, commercial or industrial use, which *102 parcel abuts upon a street containing a sanitary sewer which is part of or served by the sewer system, may be required, with the consent of the local government, to connect his building with the sewer and cease to use any other method of sewage disposal. If the charges for the use of the system are not paid within 30 days after becoming due, the Authority may disconnect the premises from the water and/or sewer system, or otherwise suspend services and recover the amount due in a civil action. ..."
 "Such provisions are necessary implements of a sanitary system constructed and operated by an agency of the State which was created and organized for the public good. ... We hold the provisions in question to be constitutional as being a reasonable exercise of the police power of the State and bearing a substantial relation to the protection and preservation of the public health. 39 C.J.S., Health, 2, p. 811, 21 at p. 835; 25 Am.Jur., Health, 3, p. 287. Like provisions have been frequently upheld against the charge of being an invasion of constitutional rights." [11] In the instant case the ordinance is in many respects a police measure. Section 8, supra, in effect provides that every occupant of buildings must pay the charges for rubbish collection which means that they must pay whether or not they use the collection service. This is, so far as the constitutional question is concerned, if anything, less stringent than the requirement that they use the service as held in the authorities, supra, dealing with sewer and water. In those cases it was held that a charge could be made for the service even though the occupants did not want it. In most of those cases the charge was said not to be a tax but rather a service charge but it is not important whether, on this phase of the case, it be called a tax or a service charge; it is justified under the police power. As long as there is no restriction in the Constitution or charter the ordinance must be held valid. It is not claimed that the charge is excessive or discriminatory (a denial of equal protection), and it appears that a benefit is received by the occupants of all property as all the probabilities point to the existence of the accumulation of rubbish described in the ordinance on all occupied property. The benefit is the availability of the collection service to all occupants--the regular service of collection and the right to accumulate rubbish, like the benefit of sewage facilities although the occupant does not choose to use them. As said in Carson v. Brockton Sewerage Com., 182 U.S. 398, 405 [21 S.Ct. 860, 45 L.Ed. *103 1151]: "Notwithstanding the former case, we think the court was correct in holding in this case that the petitioner and other property owners whose lots abutted on this public sewer did receive a benefit not common to the inhabitants of the city generally, in being permitted to discharge into it the contents of their private sewers, that the amount of such benefit was determinable by the city council, and that in its action there was nothing violative of the Federal Constitution." (See Patterson v. City of Chattanooga, 192 Tenn. 267 [241 S.W.2d 291]; Sharp v. Hall, 198 Okla. 678 [181 P.2d 972].)
 County Com'rs of Anne Arundel County v. English, 182 Md. 514 [35 A.2d 135], and Rapa v. Haines, (Ohio App.) 101 N.E.2d 733, are not in point as they involved a tax for revenue purposes.
 In the foregoing discussion we have assumed that the charge for the rubbish collection system is a charge for a service under the police power and valid as such but it is also valid if designated as a tax. As seen, the city has powers of taxation except as limited by its charter and the Constitutions, state and federal. [12] While the ordinance has many police regulations as above shown, there is no obstacle to it performing both functions, taxation and regulation, and it may be upheld as valid under either or both powers. (See Redwood Theatres, Inc. v. City of Modesto, 86 Cal.App.2d 907 [196 P.2d 119]; Gundling v. Chicago, 177 U.S. 183 [20 S.Ct. 633, 44 L.Ed. 725]; Bradley v. Richmond, 227 U.S. 477 [33 S.Ct. 318, 57 L.Ed. 603].) [13] Considering the charge as a tax, it is more like an excise tax than any other kind. It is not a property tax because it is not on an ad valorem basis. It does not purport to tax property or any interest therein, possessory or otherwise. The charge is made against "occupants" of property graduated according to the nature of the buildings occupied. The charge is not against the property. We do not have, therefore, any question of double taxation or possible invalidity for a failure to assess it according to value (see Fox etc. Corp. v. City of Bakersfield, supra, 36 Cal. 2d 136). It is similar to an excise tax as it is laid on the occupant for the accumulation and having available to him the regular collection of rubbish which may be referred to as a privilege. [14] It is said: "It is, however, difficult to arrive at any all-inclusive definition of the term 'excise tax,' since it has long since been changed from its original connotation of an impost upon a privilege. In its modern sense an excise tax is any tax which does not fall within the classification *104 of a poll tax or a property tax, and embraces every form of burden not laid directly upon persons or property." (51 Am.Jur., Taxation, 33.) And: "Taxes fall naturally into three classes, namely, capitation or poll taxes, taxes on property, and excises. In general, it may be said that all taxes fall into one or the other of the foregoing classes, any exaction which is clearly not a poll tax or a property tax being an excise." (Id., 24.) [15] It should be observed that a right may be subject to an excise tax even if the right of occupancy rather than of the accumulation and use of a collection service is involved, although it is a right which cannot be prohibited under the Constitution. It is said in Steward Machine Co. v. Davis, 301 U.S. 548, 578 [57 S.Ct. 883, 81 L.Ed. 1279, 109 A.L.R. 1293], involving the social security tax on employers: "We are told that the relation of employment is one so essential to the pursuit of happiness that it may not be burdened with a tax. Appeal is made to history. From the precedents of colonial days we are supplied with illustrations of excises common in the colonies. They are said to have been bound up with the enjoyment of particular commodities. Appeal is also made to principle or the analysis of concepts. An excise, we are told, imports a tax upon a privilege; employment, it is said, is a right, not a privilege, from which it follows that employment is not subject to an excise. Neither the one appeal nor the other leads to the desired goal."
 "As to the argument from history: Doubtless there were many excises in colonial days and later that were associated, more or less intimately, with the enjoyment or the use of property. This would not prove, even if no others were then known, that the forms then accepted were not subject to enlargement. [Citations.] But in truth other excises were known, and known since early times. Thus in 1695 (6 & 7 Wm. III, c. 6), Parliament passed an act which granted 'to His Majesty certain Rates and Duties upon Marriage, Births and Burials,' all for the purpose of 'carrying on the War Against France with Vigour.' (See Opinion of the Justices, 196 Mass. 603, 609 [85 N.E. 545]. No commodity was affected there. The industry of counsel has supplied us with an apter illustration where the tax was not different in substance from the one now challenged as invalid. In 1777, before our Constitutional Convention, Parliament laid upon employers an annual 'duty' of 21 shillings for 'every male Servant' employed in stated forms of work. [Citation.] The point is *105 made as a distinction that a tax upon the use of male servants was thought of as a tax upon a luxury. [Citation.] It did not touch employments in husbandry or business. This is to throw over the argument that historically an excise is a tax upon the enjoyment of commodities. But the attempted distinction, whatever may be thought of its validity, is inapplicable to a statute of Virginia passed in 1780. There a tax of three pounds, six shillings and eight pence was to be paid for every male tithable above the age of twenty-one years (with stated exceptions), and a like tax for 'every white servant whatsoever, except apprentices under the age of twenty one years.' [Citation.] Our colonial forebears knew more about ways of taxing than some of their descendants seem to be willing to concede."
 "The historical prop failing, the prop or fancied prop of principle remains. We learn that employment for lawful gain is a 'natural' or 'inherent' or 'inalienable' right, and not a 'privilege' at all. But natural rights, so called, are as much subject to taxation as rights of less importance. An excise is not limited to vocations or activities that may be prohibited altogether. It is not limited to those that are the outcome of a franchise. It extends to vocations or activities pursued as of common right. ... Whether the tax is to be classified as an 'excise' is in truth not of critical importance. If not that, it is an 'impost.' ... A capitation or other 'direct' tax it certainly is not. 'Although there have been from time to time intimations that there might be some tax which was not a direct tax nor included under the words "duties, imposts and excises," such a tax for more than one hundred years of national existence has as yet remained undiscovered, notwithstanding the stress of particular circumstances has invited thorough investigation into sources of powers.' Pollock v. Farmers' Loan & Trust Co., 157 U.S. 429, 557 [15 S.Ct. 673, 39 L.Ed. 759]. There is no departure from that thought in later cases, but rather a new emphasis on it. Thus, in Thomas v. United States, 192 U.S. 363, 370 [24 S.Ct. 305, 48 L.Ed. 481], it was said of the words 'duties, impost and excises' that 'they were used comprehensively to cover customs and excise duties imposed on importation, consumption, manufacture and sale of certain commodities, privileges, particular business transactions, vocations, occupations and the like.' " (Emphasis added.) Such charges as here involved have been called taxes: "... a large part of the cost of the sewer system of the City of Philadelphia *106 was raised by assessments against abutting property owners. Being imposed without any regard whatever to the extent or value of the use made of the sewer facilities, or whether any use is made, the charge provided for by the ordinance is, in legal effect, undoubtedly a tax, and the obligation to pay it could be created only by the City's exercise of its general taxing power." (In re Petition of City of Philadelphia, 340 Pa. 17 [16 A.2d 32, 35].) And a charge somewhat analogous to that here involved has been upheld as a valid excise tax (Rapa v. Haines, (Ohio App.) 101 N.E.2d 733; affd. 113 N.E.2d 121, involving a fixed tax on auto trailers used for human habitation). A contrary result was reached in County Com'rs of Anne Arundel County v. English, supra, 182 Md. 514 [35 A.2d 135], but it was based on a denial of equal protection of the law where a flat tax was placed on auto trailers with the wheels off but none on other habitations and that it was a property tax not based on value. Those things are not present here. The tax is on the factors mentioned and is not discriminatory. On the contrary, reasonable classifications are made.
 [16] Since the charge may be called an excise tax on the occupants of real property for the privilege of accumulating rubbish and having available collection service therefor and is thus not a tax on their interest in the property as an occupant or possessor thereof, and there is no unjust classification, we find no constitutional or charter provision which invalidates such a tax.
 The judgments are reversed.
 Gibson, C.J., Traynor, J., Schauer, J., Spence, J., and McComb, J., concurred.
 SHENK, J.
 I concur in the opinion and the judgments of reversal. The opinion contains a well considered discussion of the subject of municipal affairs as applied to a municipality operating under a freeholder's charter. If the same consideration had been given to that subject and been applied in the case of Wilson v. Beville, 47 Cal.2d 852 [306 P.2d 789], the judgment in that case would have been affirmed in its entirety. *107
NOTES
[fn. *] *. Rubbish includes "... paper, leaves, Christmas trees, chips, grass, pasteboard, carpets, clothing, magazines, books, straw, packing material, barrels, boxes, crates, cartons, rags, furniture and all other similar articles or materials which will burn by contact with flames of ordinary temperature which are rejected by the owner or producer thereof as worthless, or useless, but shall not include 'garbage' as that term is defined in the ordinance of the City providing for collection thereof, or materials or quantities thereof determined by the City Manager to be too large or too hazardous to burn in the City's incinerator. ... 'Non- combustible Rubbish' shall include ashes, broken glass and crockery bottles, tin cans and containers, metals, all other similar articles or materials and not to exceed three (3) cubic feet of non-combustible building materials which are rejected by the owner of producer thereof as worthless or useless, and for the purposes of this ordinance shall include those materials or quantities thereof determined by the City Manager to be too large or too hazardous to burn in the City's incinerator." (Ordinance 1764, 1.)
[fn. *] *. All property in the state shall be taxed in proportion to its value. (Cal. Const., art. XIII, 1.)
[fn. *] *. It provides the council may adopt a procedure "... for the improvement of streets, alleys or other public places, or for the removal of dirt, rubbish, weeds and other rank growths and materials which may injure or endanger neighboring property or the health or the welfare of inhabitants of the vicinity, from buildings, lots and grounds and the sidewalks opposite thereto, and for making and enforcing assessments against property benefited or affected thereby or from which such removal is made, for the cost of such improvements or removal, and may make such assessments a lien on such property superior to all other claims or liens thereon, except State, County and Municipal taxes, but no such ordinance shall prevent the Council from proceeding under general laws for said purposes." (Glendale Charter, Stats. 1921, p. 2204 as amended.)