[S. F. No. 16430. In Bank.—March 12, 1941.]

CITY AND COUNTY OF SAN FRANCISCO (a Municipal Corporation) et al., Petitioners, v. HAROLD J. BOYD, as Controller, etc., Respondent.

John J. O'Toole, City Attorney, and Walter A. Dold, Chief Deputy City Attorney, for Petitioners.

B. J. Feigenbaum, S. A. Ladar and Richard W. Jennings for Respondent.

MOORE, J., *pro tem.*—This is an original proceeding for a writ of mandate whereby petitioners seek to compel the respondent to certify to the petitioners that there is a sufficient unencumbered balance in a fund that may legally be used for the proposed expenditure of the sum of $100,000 for the services of one Purcell, a civil engineer. The municipality seeks by a contract to procure the services of Purcell for a period of five years to aid in the solution of traffic and transit problems. The certification sought was also to cover the maximum additional sums that may be expended in the fiscal year ending June 30, 1940. The petition recited that on or about the 18th day of March, 1940, the petitioners adopted a resolution No. 906, series 39, as follows: " . . . that there is a sufficient unencumbered balance in a fund that may legally be used for the proposed expenditure of $100,000.00, for the services of said . . . Purcell . . . and the maximum additional sums that may be expended in the fiscal year ending June 30, 1940, pursuant to said contract to reimburse said . . . Purcell, and that in the judgment of the Controller revenues as anticipated in the appropriation ordinance for said fiscal year and properly applicable to meet such proposed expenditure will be available in the treasury in sufficient amount to meet the same when it becomes due; . . . "

On April 12, 1940, the controller notified the board in writing that there were not sufficient unencumbered funds that could legally be used for the proposed expenditure; that in his judgment revenue properly applicable to the proposed expenditure would not be available in the treasury in sufficient amount to meet the same and that the proposed expenditure could not legally be made for the purposes and in the manner provided even if funds were available.

The respondent has filed a demurrer and an answer to the petition herein. As originally filed the answer appeared to raise an issue of fact as to the existence of unencumbered funds. By stipulation of the parties subsequently filed it

now appears, however, that there remains unencumbered and unexpended $110,000 appropriated by the petitioning Board of Supervisors in March, 1939, and thereafter approved by the Mayor. One-half of this sum ($55,000) was appropriated by Ordinance No. 101 from the surplus existing to the credit of the Municipal Railway Reconstruction and Replacement Fund "for the purpose of having a plan or plans prepared looking toward solution of the *transportation problem*". The remaining one-half ($55,000) was appropriated by Ordinance No. 102 from the accrued surplus in the County Road Fund "for the purpose of having a plan or plans prepared looking toward solution of the *traffic* problem". Inasmuch as the stipulation admits that the entire fund so appropriated "has not been expended", a consideration of the arguments and authorities advanced by respondent in support of his demurrer will serve to dispose of all legal issues with respect to the availability of such sum for the proposed contract above mentioned.

The proposed contract provides that the work contemplated is to be completed in five years; that Purcell as the contractor shall from time to time advise the petitioners relative to the solution of traffic and transit problems; that he shall submit to the Mayor and the petitioners from time to time reports and recommendations as to the feasibility and costs of the proposed projects; that he shall devote his entire time to the work contemplated and shall post a bond of faithful performance in the sum of $25,000; that the city shall pay Purcell $20,000 per annum and all actual costs and expenditures incurred in the performance of his duties in the manner contemplated by the agreement; that no liability for such costs and expenses shall arise until the same shall have been actually incurred; that Purcell shall engage his own employees, not to exceed five in number at certain specified salaries; that the city shall furnish Purcell suitable office quarters and shall reimburse him for expenses incidental thereto; that said employees shall be selected by Purcell as the contractor and that they shall have no claim for compensation against the city; that Purcell shall not be reimbursed for any expenditure incurred in any fiscal year from funds of any succeeding fiscal year; that "the cost of borings, traffic checks and the actual cost of reproducing maps and plans and the cost of performance of any duties not in

the ordinary course of employment'' of said employees is to be borne by the city; that Purcell shall be entitled to use the services of the several officers and departments of the city interested in the work which he is performing; that he shall not incur any expenses for which he has to be reimbursed unless there shall first have been regularly appropriated for the year in which the obligations are incurred a sufficient sum of money to provide for the payment of such obligations, and that if there shall be no lawful appropriation of such moneys in any year, the city shall be obligated only to the extent of said $20,000, payable to Purcell for his own services.

 Preliminary to a consideration of respondent's contention that the unencumbered and unexpended $55,000 appropriated from the surplus of the municipal railway reconstruction and replacement fund may not legally be used for the proposed expenditure under the Purcell contract, it should be stated that section 77 of the charter provides that ''On the request of a department head and approval by the administrative officer, board or commission, respectively, and on the authority of the controller, funds appropriated for a specific purpose of such department which become surplus may be transferred and used for another specific purpose within the department''. The public utilities commission already had adopted a resolution requesting the supervisors to appropriate from the unappropriated surplus of the municipal railway the sum of $55,000 to be used in payment of one-half the cost of retaining Purcell to make surveys, investigations, reports and recommendations relative to traffic and transit conditions and the extension and improvement of the municipal railway. Inasmuch as section 128.1 of the charter provides for the creation of a fund for reconstruction and replacements due to physical and functional depreciation of the utilities under the jurisdiction of the utilities commission, the suggested illegality in the appropriation from the surplus of the municipal railway must arise, if it does arise, upon the hypothesis that the proposed survey is not a reconstruction or a replacement. The word ''functional'' defining the depreciation of the utilities must include replacement of parts due to obsolescence and inadequacy as well as to complete decay. If the replacement of a property due to either inadequacy or obsolescence is to be paid out of the reconstruc-

tion and replacement fund, then the research necessary to determine the amount of reconstruction and replacement to be done is also a proper charge against such fund and the substitution of any means of transportation for a decayed or outmoded means now in place would be an ''improvement'' contemplated by the charter section. It will surely be conceded that any transit system that has been used for more than a quarter of a century must have many units that require replacement, if indeed the entire system, itself, may not be outmoded. Whether it is outmoded, however, can be determined only by the survey of an expert in the field of transportation. Inasmuch as the moneys transferred from the surplus of the municipal railway are to be used in connection with the contemplated future improvement of the transit system of the city and county, they are not in fact transferred to the use of another department but are merely ''set aside'' for the use of the railway and its improvement. The case of *Mobley* v. *Board of Public Works*, 44 Cal. App. 167 [186 Pac. 412], offers no obstacle. It was concerned with the problem of whether or not the funds of the municipal railway system might be employed for the purpose of conducting an investigation as to the condition, availability and value of a private railway system. The case is not only factually distinguishable but arose under a former charter containing many provisions not in the present charter.

As to the appropriation from the accrued surplus in the county road fund, the respondent contends that moneys derived from gasoline taxes and registration license fees, and transferred by the state to the county, cannot be used in connection with the Purcell contract. We cannot accept the contention. Section 1622 of the Streets and Highways Code provides that such moneys ''shall be deposited in a 'special road improvement fund' '' and shall be expended by the county ''exclusively for the acquisition of real property or interests therein, or the construction, maintenance or improvement of highways, bridges or culverts in that county''. That the County Road Fund Act should be construed liberally is indicated by our decision in *Long Beach* v. *Payne*, 3 Cal. (2d) 184 [44 Pac. (2d) 305], wherein it was held that highways included canals as an integral part of the highway system. Obviously, before the authorities can properly construct a bridge or a highway within the city and

county of San Francisco some intelligent planning must be done with a view both to economy and to obtaining the maximum of service from the investment made. ■ Nor do we think that section 106 of the charter offers any obstacle. That section provides that "All examinations, plans and estimates *required* by the supervisors in connection with any public improvements, exclusive of those to be made by the public utilities commission, shall be made by the director of public works, and he shall, *when requested* to do so, furnish information and data for the use of the supervisors". We are not inclined to apply this charter provision to a general survey such as is here proposed. Reasonably construed, the provision would appear to have application only to specific public improvements. Moreover, the director of public works is to furnish plans, etc., when "required" or "requested" by the Board of Supervisors. Such a provision does not purport to foreclose the procurement of the proposed assistance here sought.

■■ The respondent next contends that revenues properly applicable to meet the proposed reimbursements of Purcell will not be available in the treasury in sufficient amounts to meet the same as they become due. Inasmuch as the stipulation above referred to discloses the availability of a sum in excess of the total sum payable to Purcell, we have only to consider whether the lack of an appropriation of sufficient monies payable on the contract for the future fiscal years invalidates the contract under article XI, section 18, of the Constitution which forbids any city to incur "any indebtedness or liability in any manner or for any purpose, exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the qualified electors thereof. . . . "

Because the payment of the disbursements made by Purcell during each fiscal year as the work progresses is not provided for by any fund now on hand, respondent fears that the happening of some dire event might render unavailable such necessary moneys in the future and that consequently the sums paid to Purcell will be wholly lost to the municipality. Even though the contract were not completed and the final report were not to be made, yet we must assume that the prosecution of the work under the contract will proceed in a normal way and that partial reports will be made

from time to time. It provides for the partial accomplishment of the project year by year and it provides for the furnishing of the money to pay for the work as it progresses.

The fact that the municipality might lose some economic benefit from the payment of Purcell's fee does not invalidate the contract. (*In re City and County of San Francisco,* 191 Cal. 172 [215 Pac. 549].) The constitutional provision is not violated because there is no showing that under no possibility would funds be available for the future years. (*City of Oakland* v. *Williams,* 15 Cal. (2d) 542 [103 Pac. (2d) 168].) If the funds necessary for the current year are available, it is a fair presumption that the contract will be carried out by both parties and that the future needs for moneys will be met as the time arrives. ██ The speculation that the engineer may die or that a tidal wave might destroy the city were suitable topics for consideration of only the legislative discretion and involve such risks as a municipality must always suffer in contracting for professional services covering a period of years. The fears of respondent that no economic benefits will be derived by the city in the event of a failure of the complete performance of his contract by Purcell are not justified in view of Purcell's obligation that at all times he shall furnish advice and make reports as to conditions found to exist and recommend methods for improving such conditions; that such repairs and services will be completed with promptness and submitted when completed; that on the first of July of each year a progress report for the preceding year shall be submitted including surveys, recommendations and cost estimates; that Purcell shall develop his organization, which would be available to continue with the work in the event of his decease; that he shall attend meetings of the supervisors and all interested departments; that all of his plans and specifications, surveys and reports shall become the property of the city;—these things are of a definite economic value and justify the legislative body of the municipality in deciding to make the payments. If the board of supervisors should determine that it is worth $20,000 per annum to have Purcell merely to advise the board on matters developed by his investigation and to submit reports, that was a matter for the board to determine and it is not the function of respondent to attempt to defeat their purpose or of this court to interfere with such determination.

 Section 86 of the charter provides that "no ordinance or resolution for the expenditure of money, except the annual appropriation ordinance, shall be passed by the board of supervisors unless the controller first certify to such board that there is a sufficient unincumbered balance in a fund that may legally be used for such proposed expenditure" and that "in the judgment of the controller, revenue anticipated under the appropriation ordinance for such fiscal year and properly applicable to meet such expenditure will be available in the treasury in sufficient amount to meet the same as it becomes due". Notwithstanding the limitation prescribed by the quoted section, petitioners have broad powers as the lawmaking body to contract on behalf of the city and county. Their powers are extensive in all strictly municipal matters. (*Pasadena* v. *Charleville,* 215 Cal. 384 [10 Pac. (2d) 745].) To promise the payment of money upon the performance of a contract out of an unincumbered and unexpended fund admittedly set aside for such expenditure is not to contract a liability in violation of the charter. And this is true even though some of the contingent payments may become payable five years later. (*Krenwinkle* v. *City of Los Angeles,* 4 Cal. (2d) 611 [51 Pac. (2d) 1098]; *Doland* v. *Clark,* 143 Cal. 176 [76 Pac. 958].) Where the city and county of San Francisco contracted to reimburse a sister city in the sum of $5,000 for expenses in obtaining plans for a hospital to be used by both cities and the auditor admitted the $5,000 was available, the validity of the contract was held no longer in question. Also the possible inability of the city to meet future obligations from funds falling due in years to come was prematurely presented. That an initial payment might prove to have been injudiciously made is immaterial. Because the scheme might fail of execution for want of appropriation is immaterial. (*In re City and County of San Francisco,* 191 Cal. 172 [215 Pac. 549]; *California Pacific Title & Trust Co.* v. *Boyle,* 209 Cal. 398 [287 Pac. 968].) Where each year's consideration is severable from the remainder of the proposed plan and the obligation to pay is conditioned upon the rendition of the services, the contract is not prohibited. (*California Pacific Title and Trust Co.* v. *Boyle, supra; McBean* v. *City of Fresno,* 112 Cal. 159 [44 Pac. 358, 53 Am. St. Rep. 191, 31 L. R. A. 794].) Such a contract as that proposed is not in-

valid unless it be shown that any installment coming due in any year is in excess of the incoming revenue of that year. (*Wyckoff* v. *Force,* 61 Cal. App. 246 [214 Pac. 489].)

The authorities cited by respondent (*Chester* v. *Carmichael,* 187 Cal. 287 [201 Pac. 925]; *In re Controversy Between City and County of San Francisco and Thomas F. Boyle, as Auditor of Said City,* 195 Cal. 426 [233 Pac. 965]; *Mahoney* v. *City and County of San Francisco,* 201 Cal. 248 [257 Pac. 49]; *Browne* v. *City of Boston,* 179 Mass. 321 [60 N. E. 934]), do not apply. In all of these cases the point decided was that a municipality does not have the power to incur an obligation against the city to make future payments for the purchase price of land, in default of which payments the city would forfeit its right to purchase and lose all sums theretofore paid.

Respondent next contends that the contract is violative of the charter (1) in that it provides for an illegal duplication of the functions and duties of existing officers, departments and commissions; and (2) in that it ignores the civil service and residential provisions of the charter. Both claims are without merit. Numerous provisions of the charter are cited to show that the powers of the city and county mentioned therein are delegated to certain officials, boards and commissions named in the charter. A quotation of all of the charter provisions quoted by respondent would lengthen this opinion unduly. Suffice it to say that the delegation of the several powers of administration to officers, boards and commissions was not intended by the framers of the charter to deprive the board of supervisors of the power of legislating on behalf of the city and county. Prior to 1914, the legislative function of a city was confined to such powers only as were delegated by the charter but in that year rapid changes were occurring and others were certain to occur by reason of the growth of metropolitan centers and by reason of the available variety of implements and machinery required to function in the operation of the modern city, as well as in the extension of the comfort and convenience of the people. It was determined then to extend the powers of self-government to all municipalities who desired to accept and exercise such power. The city and county of San Francisco was one of those municipalities to accept the privilege thus extended. It adopted a charter under which it has full con-

trol of all "municipal affairs" except in those particulars limited or controlled by the Constitution or by a specific charter provision.

This power of the city is contained in section 2 of the Charter which reads: "The city and county may make and enforce all laws . . . in respect to its affairs . . . subject only to the restrictions and limitations provided in this charter. . . . *the exercise of all rights and powers of the city when not prescribed in this charter shall be as provided by ordinance or resolution of the board of supervisors.*"

Section 9 provides: "*The powers of the city and county, except the powers reserved to the people or delegated to other officers, boards or commissions by this charter, shall be vested in the board of supervisors.* . . . The board of supervisors may by ordinance confer on any officer, board or commission such other and additional powers as the board may deem advisable." While it is true that the charter provides for an independence of the various departments of the city in the performance of their respective duties, and while it is true that to the various commissions certain duties have been delegated, yet there is nothing in the language delegating such duties and functions to the police department, to the chief administrative officer, to the street traffic advisory board, to the city planning commission, to the department of public works and the public utilities commission,—nothing is said which suggests a limitation upon the powers of the board of supervisors to plan, study and legislate for civic betterment and improved conditions of municipal affairs.

This power of the board of supervisors has been the subject of numerous decisions by this court. We have consistently held that cities which have accepted the privilege of complete autonomy granted by article XI, section 6 of the Constitution may "make and enforce all laws and regulations in respect to municipal affairs subject only to the restrictions and limitations provided in their several charters" (sec. 6); that "the enumeration of some powers does not exclude the exercise of powers not enumerated except as limited by the charter and the Constitution" (*West Coast Advertising Co.* v. *San Francisco,* 14 Cal. (2d) 516, 523 [95 Pac. (2d) 138]); that where a charter is silent a city may exercise powers conferred upon it by general law provided such general powers are not inconsistent with those granted

by the charter; if no restrictions or limitations are found in the charter, the power of the city in municipal affairs is full and complete, assuming for the present purposes that sewage disposal generally is a municipal affair as distinguished from a state affair (*City of Oakland* v. *Williams, supra*); that a public agency may contract for expert services unless specifically prohibited by constitutional or statutory provision (*State Compensation Insurance Fund* v. *Riley,* 9 Cal. (2d) 126 [69 Pac. (2d) 985, 111 A. L. R. 1503]); that "in order to remove the municipal affairs from the control of general laws, it is sufficient if the city has availed itself of the offer extended to it by the Constitution. . . . " (*City of Pasadena* v. *Charleville, supra.*) The trend has been universal in recent years to permit municipalities "a wider range in undertaking to promote the public welfare or enjoyment". (*Eagan* v. *City and County of San Francisco,* 165 Cal. 576 [133 Pac. 294, Ann. Cas. 1915A, 754].)

The cases cited by respondent (*Merriam* v. *Barnum,* 116 Cal. 619 [48 Pac. 727], *Denman* v. *Webster,* 139 Cal. 452 [73 Pac. 139], *Rafael* v. *Boyle,* 31 Cal. App. 623 [161 Pac. 126], *MacLeod* v. *Long,* 110 Cal. App. 334 [294 Pac. 54], *Allen* v. *Payne,* 1 Cal. (2d) 607 [36 Pac. (2d) 614], and *Tax Factors* v. *County of Marin,* 20 Cal. App. (2d) 79 [66 Pac. (2d) 666]) do not support his contention that the proposed contract is void by reason of its alleged illegal duplication of the functions and duties of existing officers, departments and commissions. In each of the cited cases the function which the contract had attempted to duplicate had been specifically, by statute, imposed upon a specified officer. In none of them was there involved such a city charter as that involved herein. In each of them the duties of some county official, specifically established by the general law, were to be duplicated by a contract for the services of an outside party.

In the next place, respondent contends that the contract is illegal because it violates section 142 of the charter. Said section reads as follows: "All positions in all departments and offices of the city and county . . . shall be included in the classified civil service of the city and county, and shall be filled from lists of eligibles prepared by the civil service commission, excepting . . . (4) *persons employed in positions in any department for expert professional*

*temporary services,* and when such positions are exempted from said classified civil service for a specified period of said temporary service, by order of the civil service commission.'' As to subdivision 4, we must presume that it will be complied with by the civil service commission by exempting the contractor and his aides from the classified service before executing the contract.

But in considering the section respondent fails to observe the significance of the provisions of sections 140, 141, 142, 145, 146, 148. Section 140 refers to ''appointments in the public service''; section 141 refers to: *''All places of employment in the departments and offices of the city''; section 142 refers to: ''All *positions* in all departments and offices'' but specifically excepts persons employed in positions in any department for expert temporary service; section 145 refers to: *''Positions* in the uniformed forces''; *''positions* in the mechanical trades and occupations''; and for examination of laborers, allowing credit for military or naval service; section 146 refers to: *''Promotion* in the service''. Section 148 provides that *vacancies* shall be filled upon requisition of the ''appointing officer''. A reading of the entire text of said several sections indicates clearly that it was the intention of the framers of the charter that civil service should apply only to persons *employed in permanent positions* in municipal departments to the end that public service should be free from political shifting and control resulting from changes in administration. If section 142 were to be given the literal application suggested by respondent, it would be impossible for the municipality to make an independent contract with any person or corporation to render an extraordinary service or to make surveys with a view of legislation on behalf of the municipality.

The proposed contractor is not to be placed in any position provided for by the charter. He is to be engaged under a contract to do a specific job and all of the assistants which he will employ from the typist in his office to his most highly paid engineer are to be instrumentalities of his own choosing and for whom he is to be responsible. They do not become city employees in the sense of that word, as used in reference to the classified service, but are to be employees of the engineer whose contract requires that he supply the city with estimates, plans, programs and reports, such as

will enable the municipality to advance the public welfare by the improvement of conditions with respect to which his services will be rendered.

The contention presented by respondent with respect to ignoring the civil service provisions of the charter was answered in the *City of Oakland* v. *Williams, supra*. The contiguous cities having by agreement chosen Berkeley as sponsor of the proposed survey and custodian and disburser of the funds of the signatories, the city auditor insisted that the contract violated charter provisions relating to civil service. But this court held that those provisions were "without relevancy, for obviously such provisions can have no application to the employees who contract with the city of Oakland". Merely because Purcell's appointees will render services for the city does not place such appointees in a "position" or a "department" or in an "office". "Employees" under civil service occupy the relationship of servant to master and are, of course, subject to the control of the municipality but the position of the employees of the contractor will in no respect occupy a "position" in a "department" of the city as contemplated by the charter's civil service provisions. Because the supervisors in the exercise of their discretion prefer to keep check upon the details of the cost of the work to be done by the contractor rather than to contract for the survey to be done for a lump sum does not alter the fact that the contractor is employed as an independent contractor to do a specific job and to get for himself a definite profit.

Respondent's suggestion that the contract is a violation of charter provisions requiring that bids be received on all contracts is without merit. The employment of a person who is highly and technically skilled in his science or profession is one which may properly be made without competitive bidding.

Let the peremptory writ issue as prayed.

Gibson, C. J., Shenk, J., Curtis, J., and Carter, J., concurred.