[No. G045730. Fourth Dist., Div. Three. Aug. 17, 2012.]

COSTA MESA CITY EMPLOYEES' ASSOCIATION, Plaintiff and Respondent, v.
CITY OF COSTA MESA et al., Defendants and Appellants.

COUNSEL

Jones Day, Thomas R. Malcolm, John A. Vogt, Nathaniel P. Garrett and Richard J. Grabowski for Defendants and Appellants.

Burke, Williams & Sorensen, Daphne M. Anneet and Melodie K. Larsen for California Contract Cities Association as Amicus Curiae on behalf of Defendants and Appellants.

Carroll, Burdick & McDonough, Gregg McLean Adam, Jonathan Yank, Gonzalo C. Martinez; Silver, Hadden, Silver, Wexler & Levine, Stephen H. Silver, Richard A. Levine; and Donald Drozd for Plaintiff and Respondent.

OPINION

**BEDSWORTH, Acting P. J.**—Plaintiff Costa Mesa City Employees' Association (CMCEA) represents workers who are employed by the City of Costa Mesa (the City). In response to the City's plan to contract out for a variety of City services, CMCEA filed suit against the City and its chief executive officer, Thomas Hatch (collectively defendants) for injunctive and declaratory relief. CMCEA contends the City's proposed outsourcing plan violates state law as well as the parties' collective bargaining agreement. Trial on the matter has not been heard, but on July 15, 2011, the trial court granted a preliminary injunction enjoining defendants from contracting with a private entity for any of the services that are performed by CMCEA members or laying off CMCEA members as a result of such contracting. In this appeal, the sole issue is the propriety of the preliminary injunction. Defendants contend it was improvidently granted, but we disagree and affirm the trial court's ruling.

## FACTS

Costa Mesa is a general law city. In 2004, it entered into a collective bargaining agreement with CMCEA regarding the terms of employment for City workers who are represented by CMCEA. The agreement was memorialized in a memorandum of understanding (MOU), which is effective until March 13, 2013. Article 1.5 of the MOU provides, "The wages, hours and other terms and conditions of employment currently in effect for the job classifications covered herein shall remain in effect unless modified, amended or deleted by this MOU or subsequent MOUs . . . ."

Article 14 is entitled "Cost of Services." Article 14.1 recognizes, "It is in the interest of the City of Costa Mesa and CMCEA to establish a consistent

policy regarding the City's approach to evaluating the cost of providing municipal services on a regular basis in which CMCEA has an interest. It is recognized that as prudent professionals, the ongoing evaluation of costs should be a collective process of sharing information on a participative basis to develop sound decisions and appropriate practices. The City is interested in involving the employee associations to the greatest degree in this regard; and, as such, agrees to make them part of discussions regarding the contracting of services."

In article 14.2, the parties agreed "that should a decision be made to contract out for a specific service which is at the time being performed by employees covered by this MOU, the employees affected will be given sufficient notice (a minimum of six months) in which to evaluate their own situation and plan for their future. To this end, the City will make every effort to transfer and utilize regular attrition in making the necessary adjustments. The City will assist employees in this endeavor through training and through preferential treatment (under meritorious consideration) when [filling] vacancies."

The six-month notice requirement is reiterated in article 19, which pertains to layoff procedures. Particularly, article 19.2(B) provides, "In the event a decision is made by the City to contract out for a specific service performed by City employees, the City will give the affected employees a minimum of six (6) months advance notification in which to evaluate their own situation and assist in planning for the future. The City shall meet and consult with CMCEA on such matters as the timing of the layoff and the number and identity of the employees affected by the layoff." Article 19.2(B) also provides that "thirty (30) calendar days before the effective date of layoff, the appointing authority shall notify the Administrative Services Director of the intended action with reasons therefore."

On March 1, 2011, the City Council approved an outsourcing plan to contract out for a variety of City services, including street sweeping, graffiti abatement, animal control, jail operations, special event safety, information technology, graphic design, reprographics, telecommunications, payroll, employee benefit administration, building inspection, and park, fleet, street and facility maintenance. Thereupon, on March 17 and March 31, 2011, the City's public services director sent layoff notices to over 100 City workers who are represented by CMCEA. The notices stated that in light of the City Council's decision to contract out for City services, "it is necessary to issue this layoff notice to every affected employee in a position subject to outsourcing." After informing the recipient he or she was such an employee, the notices provided, "[Y]ou will be subject to layoff effective your last scheduled work shift for the pay period ending September [30], 2011. This

layoff notice is contingent upon [your position] being outsourced" and "is subject to being rescinded pending City Council's future action on this matter."

The notices also advised that employees "who will be laid off should work closely with the Human Resources Division on questions, continuance of health benefits, retirement options and explanation of such programs as unemployed insurance benefits." The notices concluded with the public services director's "sincere[] regret that the City's current conditions require that City employees be laid off."

On May 16, 2011, CMCEA filed suit against defendants for injunctive and declaratory relief. Its complaint alleges the City's outsourcing plan violates the Government Code in that it calls for the outsourcing of jobs that do not involve "special services." (Gov. Code, §§ 37103, 53060.)[1] The suit also alleges the plan violates the parties' MOU because the City did not meet with CMCEA to determine which specific services should be contracted out and how to best mitigate layoffs; rather, it unilaterally decided to outsource a vast number of jobs without input from CMCEA.

In targeting the City's outsourcing plan, CMCEA requested a preliminary injunction to prevent the plan's implementation while its lawsuit was pending. Addressing the need for preliminary relief, CMCEA claimed the City was in the process of preparing bids or requests for proposals (RFP's) to be issued to various vendors. CMCEA believed the RFP's would "be issued to vendors and returned within the next few weeks and [would] culminate in contracts for City services, thereby resulting in the layoffs of all or substantially all employees represented by" CMCEA.

CMCEA also claimed, "Unless and until injunctive relief sought herein is granted, the City will continue to undertake actions culminating in the contracting out to private vendors for non-special services in excess of the powers conferred to such a municipality and such contracting out will . . . consequently be void, unenforceable and ultra vires. Furthermore, . . . the City will cause great and irreparable injury to employees . . . whose services will be supplanted by private vendors by virtue of unlawful outsourcing contracts."

In their opposition papers, defendants argued the MOU does not require the City to negotiate with CMCEA regarding the *decision* to outsource, but merely requires the City to consult with CMCEA regarding the *impact* of any outsourcing decisions that it arrives at. Defendants also argued the City has

---

[1] Unless noted otherwise, all further statutory references are to the Government Code.

broad statutory and constitutional authority to contract out for City services. In fact, under the Government Code, it "may contract with any other local agency for the performance . . . of municipal services or functions . . . ." (§ 54981.) Thus, regardless of whether its outsourcing plan involves jobs that entail special services, the City may outsource them to another city or municipality.

Defendants also maintained a preliminary injunction was unwarranted because they had issued only one RFP to date (pertaining to the operation of the City's jail facility), and regardless of how many RFP's it ultimately issues, the City is not legally obligated to accept any bids it may receive from prospective vendors. Speaking to the nature of the bidding process, defendant Hatch, the City's chief executive officer, declared, "While it is true that the City leadership is earnestly pursuing the outsourcing of City services in furtherance of ensuring the most cost-effective provision of public service, it remains possible that the RFP process will not result in the identification of a public or private entity or person qualified or willing to provide these or other services which may be the subject of future RFP's." Given this possibility, defendants argued it was too early to ascertain what would come of the RFP's or how City workers might ultimately be affected by them. That is why the layoff notices were identified as being contingent in nature and subject to rescission by the City. All things considered, the City did not believe its outsourcing plan posed an imminent threat to CMCEA's members so as to justify the issuance of a preliminary injunction.

In replying to defendants' arguments, CMCEA conceded the City is statutorily authorized to contract out for services with another local agency. However, CMCEA insisted the City could not contract out for services to a private entity unless the contract involved special services. CMCEA also submitted declarations from several of its members who stated they had reviewed draft proposals of RFP's the City intended to send out. According to these members, the services contemplated in those draft proposals have long been performed by City workers and do not "involve additional services, skills, expertise or training otherwise possessed or currently rendered" by City workers.

Defendants did not offer any evidence to dispute this assertion. In fact, in the RFP they issued for the City's jail services, they recognized, "Since the inception of the Jail, the City Police Department has maintained a reputation for the efficient and effective handling of operations, supervision, and management of the facility."

On July 5, 2011, the trial court held a hearing on CMCEA's request for a preliminary injunction. Speaking to the City's decision to send out the layoff

notices, the court observed, "This appears to be a significant step in the ordering of outsourcing of the city employee services . . . ." Indeed, the court believed the notices "indicated or suggested that people were going to be laid off at a certain date and time." As for the equities underlying CMCEA's request for preliminary relief, the court stated, "If the employees are terminated and new contracts for services are created in violation of the Government Code, there does not appear to be any way to undo the harm created. The City will necessarily have to hire back former employees and void the illegal contracts. Alternatively, the option of preventing the contracts from happening would specifically enforce the current law and prevent any premature action by the City . . . ."

Ultimately, the court decided to grant CMCEA's request for a preliminary injunction. It enjoined defendants from contracting with a nonlocal agency for any of the services currently being performed by CMCEA members or laying off CMCEA members as a result of such contracting. The trial was originally scheduled to begin in April of this year, but it has been continued pending this appeal.

I

Defendants contend the trial court erred in granting the preliminary injunction. We disagree.

■ "As its name suggests, a *preliminary* injunction is an order that is sought by a plaintiff *prior to a full adjudication of the merits of its claim.* [Citation.]" (*White v. Davis* (2003) 30 Cal.4th 528, 554 [133 Cal.Rptr.2d 648, 68 P.3d 74].) The purpose of such an order "is to preserve the status quo until a final determination following a trial." (*Scaringe v. J. C. C. Enterprises, Inc.* (1988) 205 Cal.App.3d 1536, 1542 [253 Cal.Rptr. 344].) It "does not constitute a final adjudication of the controversy." (*Ibid.*)

"To obtain a preliminary injunction, a plaintiff ordinarily is required to present evidence of the irreparable injury or interim harm that it will suffer if an injunction is not issued pending an adjudication of the merits." (*White v. Davis, supra,* 30 Cal.4th at p. 554; see generally Code Civ. Proc., § 526, subd. (a)(2) [preliminary injunction may issue when it appears the plaintiff would suffer great or irreparable injury from the commission or continuance of some act during the litigation].) While the mere possibility of harm to the plaintiffs is insufficient to justify a preliminary injunction, the plaintiffs are "not required to wait until they have suffered *actual harm* before they apply for an injunction, but may seek injunctive relief against the *threatened infringement* of their rights." (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1292 [240 Cal.Rptr. 872, 743 P.2d 932], italics added; accord, *City of Torrance v.*

*Transitional Living Centers for Los Angeles, Inc.* (1982) 30 Cal.3d 516, 526 [179 Cal.Rptr. 907, 638 P.2d 1304] [injunctive relief is available where the injury sought to be avoided is " 'actual or threatened' "]; *7978 Corporation v. Pitchess* (1974) 41 Cal.App.3d 42, 46 [115 Cal.Rptr. 746] [same].)

If the threshold requirement of irreparable injury is established, then we must examine two interrelated factors to determine whether the trial court's decision to issue a preliminary injunction should be upheld: "(1) the likelihood that the moving party will ultimately prevail on the merits and (2) the relative interim harm to the parties from issuance or nonissuance of the injunction." (*Butt v. State of California* (1992) 4 Cal.4th 668, 677–678 [15 Cal.Rptr.2d 480, 842 P.2d 1240].) Appellate review is generally limited to whether the trial court's decision constituted an abuse of discretion. (*Ibid.*) However, "[t]o the extent that the trial court's assessment of likelihood of success on the merits depends on legal rather than factual questions, [such as when the meaning of a contract or a statute are at issue,] our review is de novo." (*O'Connell v. Superior Court* (2006) 141 Cal.App.4th 1452, 1463 [47 Cal.Rptr.3d 147].)

In the end, the burden is on the party challenging the preliminary injunction to prove it was improperly granted. (*ReadyLink Healthcare v. Cotton* (2005) 126 Cal.App.4th 1006, 1016 [24 Cal.Rptr.3d 720].) On appeal, " 'we must interpret the facts in the light most favorable to the prevailing party and indulge in all reasonable inferences in support of the trial court's order.' [Citation.]" (*Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1450 [125 Cal.Rptr.2d 277].)

As to the threshold requirement of irreparable harm, defendants concede job loss qualifies as such an injury. But they insist CMCEA's members were not in imminent danger of losing their jobs when CMCEA filed suit because, at that time, the City had issued only one RFP for a single City service, that being jail operations. We disagree. CMCEA submitted declarations from a number of City workers who said they had reviewed drafts of proposed RFP's for many other City services. This indicates that more RFP's were in the works. Indeed, defendant Hatch, the City's CEO, admitted in his declaration, "City leadership is earnestly pursuing the outsourcing of City services . . . ." While he said there was a "possibility" the RFP process would not actually result in the outsourcing of any jobs, it is readily apparent CMCEA's members were in serious peril of being terminated.

That was made evident by the many layoff notices that the City sent out. The trial court's interpretation of the notices as a "significant step" in the outsourcing process is supported by the fact the notices set September 30, 2011, as the expected date the recipients would be terminated. The notices

did state they were contingent on the recipient's job being outsourced and were subject to being rescinded, but they also made clear the City Council was presently determined to pursue a plan that called for the recipient's job to be outsourced. And, according to CEO Hatch, the City was pursuing that plan *in earnest.* The notices also referred the recipients to the City's human resources divisions for help with job loss issues and expressed regret "the City's current conditions *require* that City employees be laid off." (Italics added.) Clearly, the recipients of the layoff notices were facing a very real threat of losing their jobs.

■     Defendants claim the preliminary injunction was prematurely issued because until any outsourcing contracts are finalized, there is no way of knowing which particular jobs are going to be outsourced or whether those jobs entail services that may be legally outsourced to the private sector. Defendants base their claim on *Service Employees Internat. Union v. Board of Trustees* (1996) 47 Cal.App.4th 1661 [55 Cal.Rptr.2d 484], but that case involved an appeal from an order granting summary judgment; the propriety of the trial court's decision to deny a preliminary injunction was not at issue. Cases are not authority for issues they did not consider. (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 323 [93 Cal.Rptr.3d 559, 207 P.3d 20].) In any event, defendants' authority is factually inapposite in that only a few government workers were impacted by the outsourcing deal in that case, and they were all able to keep their jobs, even after the deal went through. (See *Service Employees Internat. Union v. Board of Trustees, supra,* 47 Cal.App.4th at p. 1664.)

Here, quite obviously, both the scope and consequences of the City's proposed outsourcing plan are very different. Not only does the plan have the potential to impact over 100 members of the City's workforce, there is no evidence that any of the affected members will be able to retain their jobs if the plan is implemented. Moreover, the plan doesn't just target one particular position or department; rather, it is aimed at 18 different sectors of the City's workforce that provide a wide array of services to the citizens of Costa Mesa. This sets the plan apart from *Service Employees Internat. Union v. Board of Trustees,* and any of the other outsourcing cases cited by the parties in this proceeding.

In arguing the preliminary injunction was premature, defendants also emphasize the fact the layoff procedures set forth in the MOU require the City's administrative services director to be notified 30 days before an employee is laid off as a result of any outsourcing decision. However, the MOU does not spell out what steps the director must take in terms of notifying the affected employee or CMCEA. Thus, it is unclear whether, as defendants contend, the 30-day period would provide a sufficient window of

opportunity for an aggrieved worker to seek judicial relief. Given that the City had already decided to pursue its outsourcing plan, and in light of the many layoff notices it sent out, we do not believe the preliminary injunction was premature. At the time it was issued, CMCEA's members were in serious danger of losing their livelihoods, and we cannot say the trial court abused its discretion in finding the irreparable injury requirement was met in this case.[2]

## II

■ Nor did the trial court abuse its discretion in determining CMCEA would incur greater interim harm without a preliminary injunction than the City would if one were issued. As explained in the previous part, CMCEA members who received layoff notices were faced with the daunting prospect of being terminated if the City's outsourcing plan was not preliminarily enjoined. Job loss is always a serious matter, and in this postrecession era of high unemployment, it cannot be taken lightly. Defendants admit that losing a job, and the income it entails, amounts to irreparable harm. (*White v. Davis, supra*, 30 Cal.4th at p. 559 [lost wages and other benefits during lawsuit over budget impasse constituted serious hardship to those affected by impasse].)

Notwithstanding the prospect of City workers losing their jobs, however, defendants contend, "The residents and taxpayers of Costa Mesa have a substantial interest in a local government that is able to provide better municipal services while improving its financial security." Defendants also submit that, unless the preliminary injunction is lifted, the City cannot even *attempt* to further that interest by putting its outsourcing plan in motion.

We do not question the citizenry's interest in cost-effective government. However, contrary to defendants' claim, the trial court's preliminary injunction does not prevent the City from moving forward with its outsourcing plan. It can still issue RFP's, receive bids, and assess whether outsourcing is a prudent course of action for the particular services at issue. This would lay

---

[2] Relying on *Johnston v. Board of Supervisors* (1947) 31 Cal.2d 66 [187 P.2d 686], disapproved on other grounds in *Bailey v. County of Los Angeles* (1956) 46 Cal.2d 132, 139 [293 P.2d 449], defendants maintain injunctions against a municipality require special scrutiny. However, the injunction in *Johnston* required special scrutiny because it prevented county supervisors from taking legislative action in the first place. (See 6 Witkin, Cal. Procedure (5th ed. 2008) Provisional Remedies, § 332, pp. 277–278.) While the law disfavors injunctions that preempt the legislative process by stopping the very enactment of legislation, the injunction in this case targets a legislative decision that has already been made, namely, the City Council's decision to contract out for City services. There is no prohibition against seeking injunctive relief when, as here, the implementation of a specific legislative decision is challenged as being unlawful. (*Id.*, § 331, p. 276.) Courts must be mindful not to interfere with the legislative process before it plays out, but once a city enacts a particular plan, injunctive relief may issue if the plan entails measures that exceed the city's powers. (*Ibid.*)

the groundwork for the City's outsourcing plan, even though the trial court's injunction presently prohibits the City from actually consummating any outsourcing contracts with a nonlocal agency. Balancing the respective interim harm suffered by both parties, we conclude the trial court did not abuse its discretion in determining the equities favored the implementation of a preliminary injunction. Keeping in mind the injunction is only a temporary measure, we see no reason to disturb the court's finding in this regard.

## III

We now turn to the merits of CMCEA's claims. Regardless of the balance of interim harm, the preliminary injunction cannot be allowed to stand unless there is "some possibility" CMCEA will prevail on the merits of its action. (*Butt v. State of California, supra,* 4 Cal.4th at pp. 677–678; *Aiuto v. City and County of San Francisco* (2011) 201 Cal.App.4th 1347, 1361 [135 Cal.Rptr.3d 617].) We are convinced this final prerequisite for obtaining interim injunctive relief has been met.

CMCEA's lawsuit alleges the City's outsourcing plan violates both the parties' MOU and state law. Regarding the MOU, it is clear article 1.5 generally prohibits the City from altering the terms or conditions of employment of CMCEA members. Articles 14 and 19.2(B) do contemplate the outsourcing of City services, which would be an exception to that general prohibition. But article 14 also sets forth an important condition that must be met before outsourcing may occur. In particular, article 14.1 provides "the ongoing evaluation of costs should be a collective process of sharing information on a participative basis to develop sound decisions and appropriate practices. The City is interested in involving the employee associations to the greatest degree in this regard; *and, as such, agrees to make them part of discussions regarding the contracting of services.*" (Italics added.)

There is nothing in the record that suggests the City involved CMCEA in any discussions regarding the evaluation of costs or the contracting of services. The City did send layoff notices to CMCEA members *after* it had already decided on its outsourcing plan, but there is no evidence it ever discussed these matters with CMCEA beforehand, as required by article 14.1.

Defendants argue the parties would not have bothered to include a six-month layoff notice requirement in their agreement, as set forth in article 14.2 and article 19.2(B), if it was barred from contracting out for City services. But this is a non sequitur. The MOU does not prohibit outsourcing altogether. Nor does it give CMCEA a veto over such plans. Per article 14.2, it simply requires the City to include the CMCEA in the process of evaluating costs and developing effective work practices, which may include the contracting

out of services. Since there is no evidence the City included CMCEA in the decisionmaking process that led to the City's outsourcing plan, the MOU provides a basis for CMCEA's lawsuit and indicates "some possibility" of success on its contract claim.

State law also supports CMCEA's lawsuit. Under the California Constitution, "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7.) This provision "is both a grant and a limitation upon the power of cities and counties to enact legislation." (*California Water & Telephone Co. v. County of Los Angeles* (1967) 253 Cal.App.2d 16, 27, fn. 13 [61 Cal.Rptr. 618].) In applying it, we must remember that uniformity with respect to state laws is an important consideration, and when the state Legislature has spoken on a particular issue, local governments are not at liberty to take a conflicting course of action. (*Galvin v. Board of Supervisors* (1925) 195 Cal. 686, 692–693 [235 P. 450].) A local ordinance that prohibits what a statute authorizes, or authorizes what the statute prohibits, is inimical to the statute. (See *Big Creek Lumber Co. v. County of Santa Cruz* (2006) 38 Cal.4th 1139, 1161 [45 Cal.Rptr.3d 21, 136 P.3d 821].)

Similar principles govern a city's contracting authority. On the one hand, it is beyond question that cities have the implied authority to enter into contracts to carry out their necessary functions. (*Morrison Homes Corp. v. City of Pleasanton* (1976) 58 Cal.App.3d 724, 734 [130 Cal.Rptr. 196].) But it is equally established that cities " ' "must comply with state statutes that specify requirements for entering into contracts. [Citations.]" ' [Citation.] ' "A contract entered into by a local government without legal authority is 'wholly void,' ultra vires, and unenforceable." ' [Citation.]" (*Poway Royal Mobilehome Owners Assn. v. City of Poway* (2007) 149 Cal.App.4th 1460, 1472–1473 [58 Cal.Rptr.3d 153].) In other words, whether enacting ordinances or entering into contracts, cities are required to act in conformity with state law and are powerless to take measures that conflict with the general laws of California. (Cal. Const., art. XI, § 7; see § 37100 [a city "may pass ordinances not in conflict with the Constitution and laws of the State or the United States"].)[3]

---

[3] That is not to say, as CMCEA contends, that cities only have those powers expressly conferred on them by the Legislature. As amicus curiae California Contract Cities Association correctly notes, our Supreme Court has long recognized that cities derive their authority from both the Legislature *and* the California Constitution. (*Hurst v. City of Burlingame* (1929) 207 Cal. 134, 138 [277 P. 308], overruled on other grounds in *Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582 [135 Cal.Rptr. 41, 557 P.2d 473].) And although, as we have explained, a city's constitutional authority is subject to the general laws of the state, "it is otherwise as broad as that of the Legislature" itself. (8 Witkin, Summary of Cal. Law (10th ed. 2005) Constitutional Law, § 984, p. 548.)

CMCEA argues the City's outsourcing plan conflicts with two statutes that speak to the issue of "special services." The first is section 37103, which provides that a city "may contract with any specially trained and experienced person, firm, or corporation for *special services* and advice in financial, economic, accounting, engineering, legal, or administrative matters." (§ 37103, italics added.) The second is section 53060, which provides, "The legislative body of any public or municipal corporation or district may contract with and employ any persons for the furnishing to the corporation or district *special services* and advice in financial, economic, accounting, engineering, legal, or administrative matters if such persons are specially trained and experienced and competent to perform the *special services* required." (§ 53060, italics added.)[4]

■ In contrast to these two statutes, section 54981 does not limit a city's contracting rights to the acquisition of special services. Rather, it provides more broadly that "[t]he legislative body of any local agency may contract with any other local agency for the performance by the latter of municipal services or functions within the territory of the former." (§ 54981.) However, by its terms, section 54981 only authorizes contracts between local agencies, such as cities. It does not authorize a city to contract with a private entity for city services.

And that is the crux of this case. It is CMCEA's position that sections 37103 and 53060 generally prohibit cities from contracting with a *private* entity, unless the contract is for *special services*. If that is the case, then any effort by the City to contract with a private entity for nonspecial services would be suspect as being violative of those particular statutes, as well as the state Constitution because, as we have explained, a city is not empowered to act in contravention of state law. (Cal. Const., art. XI, § 7.)

■ Defendants argue that is not in fact the case. In their view, the special services statutes are intended solely to allow cities to bypass the competitive bidding process when contracting for special services, not limit their right to contract for such services. However, in cases involving the special services statutes, the issue is typically not whether the government may properly contract out for the services in question absent competitive bidding. Instead, the question is whether the agency has the basic underlying authority to contract out for the subject services in the first place. (See, e.g., *Montgomery v. Superior Court* (1975) 46 Cal.App.3d 657, 668 [121 Cal.Rptr. 44] [in finding prosecutorial duties involved special services under §§ 37103 and 53060, court framed issue in terms of whether the city had the authority to employ outside counsel for criminal law enforcement]; *California Sch. Employees*

---

[4] Sections 37103 and 53060 also authorize local agencies to pay special service providers such compensation as they deem proper.

*Assn. v. Sunnyvale Elementary Sch. Dist.* (1973) 36 Cal.App.3d 46, 60 [111 Cal.Rptr. 433] [whether school district's outsourcing of research and development services was permissible turned on whether the district had the authority to contract for such services under § 53060]; *Jaynes v. Stockton* (1961) 193 Cal.App.2d 47, 54 [14 Cal.Rptr. 49] [under § 53060, public agencies generally lack the authority to contract out for services which the law requires a designated public official to perform].) These cases make clear that courts will not hesitate to invalidate a service contract between a local agency and a private entity if the contract involves services that are not considered special. Judicial scrutiny here is directed to the authority of the agency to act, not the means by which it does so.

Consistent with this approach, the Attorney General has determined the special services statutes constitute a limitation on the power of local agencies to outsource services, as opposed to the particular method by which they may do so. In fact, in 1993, the Attorney General issued an opinion that addresses the fundamental question presented in this case, i.e., whether such statutes allow the outsourcing of nonspecial services to achieve cost savings for the government. (76 Ops.Cal.Atty.Gen. 86 (1993).) In answering that question, the Attorney General analyzed section 53060 and the county analogue to section 37103, which is section 31000.[5] The Attorney General determined, "It is evident that the authority to contract as provided in both sections 31000 and 53060 is expressly limited to 'special services' in specified areas, and is further limited to contractors who are specially trained, experienced, and competent to perform such services." (76 Ops.Cal.Atty.Gen., *supra*, at p. 88.) "Nothing in [those sections] suggests that a county may contract for services without regard to the 'special services' limitation, solely on the basis of cost savings. We note in this regard that in the Legislature's grant of a particular power, ' " 'there is an implied negative; an implication that no other than the expressly granted power passes by the grant; that it is to be exercised only in the prescribed mode . . . .' " ' [Citation.]" (*Id.* at p. 89.) In light of that implication, and because the Legislature has not expressly granted counties the authority to outsource for the purpose of achieving cost savings, the Attorney General concluded a county "may not enter into a contract with persons to provide the same level of services, but at less expense, than presently performed by its civil service employees." (*Id.* at p. 91.)

---

[5] Section 31000 states, "The board of supervisors may contract for special services on behalf of the following public entities: the county, any county officer or department, or any district or court in the county. Such contracts shall be with persons specifically trained, experienced, expert and competent to perform the special services. The special services shall consist of services, advice, education or training for such public entities or the employees thereof. The special services shall be in financial, economic, accounting . . . , engineering, legal, medical, therapeutic, administrative, architectural, airport or building security matters, laundry services or linen services."

■ Of course, where the Legislature has expressed its intent to permit a local agency to contract for a specialized service and the agency is unable to provide it itself, there is no legal impediment to outsourcing for that service. (See, e.g., *Service Employees Internat. Union v. Board of Trustees, supra,* 47 Cal.App.4th 1661 [community college district was authorized to contract with Barnes & Noble for the operation of its campus bookstores since the district's employees did not have the specialized training or expertise to provide the services at issue].) In the present case, however, statutory outsourcing authority exists for only two of the many services the City seeks to contract out, those being operation of the City's jail (Pen. Code, § 6031.6) and administration of its payroll services (§§ 37103, 53060). There is no indication the Legislature intended to allow the City to outsource any of the other services at issue in this case. Nor is there any evidence the City's workforce is incapable of providing any of those services. These circumstances support our conclusion there is "some possibility" of the eventual success of CMCEA's lawsuit. (See 85 Ops.Cal.Atty.Gen. 83, 86 (2002) [in opining special services statutes prohibited a general law city from contracting with a private company to issue parking violations, the Attorney General found it significant that the Legislature has not authorized such contracting and the "employees of the city in question have been issuing parking citations and may continue to do so without 'experts' having to undertake these services that are commonly performed as a municipal function"].)

■ Relying on *San Francisco v. Boyd* (1941) 17 Cal.2d 606 [110 P.2d 1036] (*Boyd*), defendants argue that unless a city is legally obligated to provide a particular service with a designated public employee, it is free to contract in the private sector for that service. However, *Boyd* does not so hold. Rather, it simply recognizes that, where the law *does* require a service to be performed by a specified government official, the outsourcing of that service to a private company is usually prohibited. (*Id.* at p. 618.) But that does not mean outsourcing is permitted in all situations where the law *does not* require the service to be performed by a particular employee. There is nothing in *Boyd* that supports that result, and if that were the case, the special services statutes would be largely meaningless. We are not inclined to adopt an interpretation of the statutes that would have that effect. (*Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1286 [48 Cal.Rptr.3d 183, 141 P.3d 288] [laws should not be construed so as to render them nugatory].)

In any case, *Boyd* is distinguishable because unlike Costa Mesa, which is a general law city, the city in question there was a charter city. As such it had nearly complete control over its municipal affairs and was not bound by the general laws of the state. (*Boyd, supra,* 17 Cal.2d at pp. 616–618.) This was an important consideration in the Supreme Court's decision to uphold the private contracting arrangement at issue in that case. (*Ibid.*; see generally *Riveros v. City of Los Angeles* (1996) 41 Cal.App.4th 1342, 1359, fn. 16 [49

Cal.Rptr.2d 238] [under the state Constitution, charter cities, unlike general law cities, have the "plenary authority to provide for the 'compensation, method of appointment, qualifications, tenure of office and removal' of their employees"].)

Nor are we swayed by the 1991 Attorney General opinion cited by defendants that concludes cities have the implied authority to contract with a private entity to operate a local jail or detention facility. (74 Ops.Cal.Atty.Gen. 109 (1991).)[6] In coming to that conclusion, the Attorney General found it significant that the Legislature has specifically authorized the establishment of privately operated work furlough programs and community correctional centers at the state and county level. (74 Ops.Cal.Atty.Gen., *supra*, at pp. 110–111.) The Attorney General also relied on the fact that no state law expressly prohibits cities from establishing a private detention facility, and section 37112 gives cities the authority to perform all acts which are necessary or proper to carry out their statutory functions. (74 Ops.Cal.Atty.Gen., *supra*, at p. 111.)

There are two reasons why the Attorney General's 1991 opinion on privately operated jails is not persuasive here. First, the Attorney General did not address any of the special services statutes. Yet, as explained above, the Attorney General himself recognized in 1993 that those statutes generally limit the contracting authority of local agencies to the acquisition of services that are specialized. Opinions sanctioning the outsourcing of government services without reference to the special services statutes are simply not that helpful in determining the legality of the City's outsourcing plan in this case. (See, e.g., *California School Employees Assn. v. Kern Community College Dist.* (1996) 41 Cal.App.4th 1003 [48 Cal.Rptr.2d 889] [upholding a school district's authority to contract with a private company to perform groundskeeping services at one of its schools].)[7]

---

[6] In the wake of this opinion, the Legislature enacted Penal Code section 6031.6, which, as noted above, expressly authorizes cities to do this.

[7] In *Kern*, the court did not address the special services statutes and was dealing with the right of a nonmerit school district to contract for private services. Nonmerit school districts are not subject to the statutory provisions limiting the right of merit school districts to utilize the services of nonclassified employees. (*California School Employees Assn. v. Kern Community College Dist., supra,* 41 Cal.App.4th at pp. 1011–1012; accord, *Service Employees Internat. Union v. Board of Trustees, supra,* 47 Cal.App.4th 1661 [involving nonmerit school district]; cf. *California School Employees Assn. v. Del Norte County Unified Sch. Dist.* (1992) 2 Cal.App.4th 1396 [4 Cal.Rptr.2d 35] [merit school district may not contract with private company to perform regular supervision of the district's custodial and maintenance workers].) Moreover, unlike cities, school districts are governed by the Education Code, which is designed to give school districts very broad authority in carrying out their responsibilities and *expressly* authorizes school districts to contract out for services that are normally performed by

■ Second, contrary to the Attorney General's suggestion in his 1991 opinion, we do not believe the Legislature's decision to allow *states* and *counties* to enter into private contracts for a particular service suggests that *cities* may inevitably follow suit. In fact, if anything, it would seem to suggest just the opposite. "Where the Legislature simultaneously empowers one agency to [act] and declines similarly to empower another, there is a strong inference of a legislative intent to withhold the authority from the nonempowered agency." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1396 [241 Cal.Rptr. 67, 743 P.2d 1323]; accord, 76 Ops.Cal.Atty.Gen., *supra*, at pp. 89–90.) In that particular situation, "it is not the province of this court to imply an intent left unexpressed." (*Mutual Life Ins. Co. v. City of Los Angeles* (1990) 50 Cal.3d 402, 412 [267 Cal.Rptr. 589, 787 P.2d 996].) The fact the Legislature has allowed outsourcing at one level of local government does not prove it intended to allow outsourcing at another.

Still, in arguing in favor of the City's outsourcing plan, defendants maintain the special services statutes were never intended to restrict a city's authority to contract out for any particular type of services. In support of this contention, defendants rely on an interdepartmental memo that was written by a deputy attorney general to Governor Earl Warren when section 53060 was enacted back in 1951.[8] The memo states that irrespective of section 53060, cities have always had the power to contract with technical experts when their services are necessary to carry out the cities' functions. The memo also suggests section 53060 would give cities greater authority to contract out for services that have historically been performed by city workers and officials. But it cautions against construing section 53060 as a "carte blanche for the hiring of services without regard to the purpose to be served thereby." In fact, the memo cites an Attorney General opinion that reaffirms the principle that government agencies may contract only for services that do not entail the performance of *special* services. (17 Ops.Cal.Atty.Gen. 161 (1951) [a county may not pay expenses and hire a secretary for a committee that is charged with general factfinding duties, as opposed to investigating a specific technical problem or offering expert advice].) Thus, even the legislative history of section 53060 relied upon by defendants for support is at best equivocal.

■ In our view, sections 53060 and 37103 are actually quite germane to the plan in that they limit a city's right to contract with private entities. By implication, and as interpreted over the years, the statutes generally prohibit a

---

classified workers. (Ed. Code, §§ 35160, 35160.1, 45103.1; see generally 93 Ops.Cal.Atty.Gen. 63 (2010) [Ed. Code allows school districts to contract with private organizations to provide programs for at-risk students].)

[8] The memo was actually submitted to us by CMCEA. We grant CMCEA's request to judicially notice it. (Evid. Code, §§ 452, subd. (c), 459, subd. (a).)

city from contracting with a private entity for nonspecial services. Our conclusion in this regard is not necessarily dispositive of all the issues in this case. Factual issues such as the precise nature of the services the City seeks to outsource may affect the final outcome. At this point in the controversy, however, we are convinced CMCEA's members would suffer irreparable harm in the absence of a preliminary injunction, there is "some possibility" they will prevail on both their contract and statutory claims (which are *independent* grounds for relief), and the relative harm to the parties favors preliminary relief. Therefore, we will not disturb the trial court's decision to grant a preliminary injunction in CMCEA's favor.

## DISPOSITION

The trial court's order granting CMCEA's request for a preliminary injunction is affirmed. CMCEA is awarded costs on appeal.

Moore, J., and Aronson, J., concurred.

On October 10, 2012, the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied November 28, 2012, S206157.